UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COZY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 21-10134-JGD |
| v. ) | |
| ) | |
| DOREL JUVENILE GROUP, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF DECISION AND ORDER ON
PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS**

September 29, 2022

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff, Cozy, Inc. ("Cozy"), is a company owned by Dr. Arjuna Rajasingham. Cozy holds a number of patents. It has brought this action against Dorel Juvenile Group, Inc. ("Dorel"), alleging that Dorel has infringed on four patents, referred to herein as "the '298, '739, '835 and '416 Asserted Patents," in connection with Dorel's "Air Protect® technology" that is used in its child safety seats. Dorel has brought counterclaims against Cozy alleging inequitable conduct by Cozy in obtaining these patents.

This matter is presently before the court on "Plaintiff Cozy, Inc.'s Motion to Dismiss Defendant's Counterclaims" (Docket No. 70).[1] Cozy contends that Dorel's allegations are "not

---

[1] The counterclaims ("Counterclaims") begin on page 28 of "Defendant Doral Juvenile Group, Inc.'s First Amended Answer to Plaintiff Cozy, Inc.'s Complaint for Patent Infringement and Counterclaims" (Docket No. 58).

plausible," that Dorel only learned of the technology at issue by hiring Cozy's engineer, and that the allegations do not rise to the level of actionable inequitable conduct. (See "Plaintiff Cozy, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss Defendant's Counterclaims" (Docket No. 71) ("Cozy Mem.") at 2). For the reasons detailed herein, Dorel has alleged sufficient facts to withstand a motion to dismiss, and the merits of its counterclaims will have to be assessed on a fuller record. Cozy's motion to dismiss is DENIED.

## II. STATEMENT OF FACTS

Subject to pleading requirements discussed more fully below, in ruling on a motion to dismiss, the court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleading party. See Legal Sea Foods, LLC v. Strathmore Ins. Co., 36 F.4th 29, 33-34 (1st Cir. 2022). See also Finjan, Inc. v. Check Point Software Techs., Inc., No. 18-cv-02621-WHO, 2019 WL 330912, at *6 (N.D. Cal. Jan. 25, 2019) (in determining whether defendant's claim of inequitable conduct meets heightened pleading standard of Fed. R. Civ. P. 9(b), court construes allegations in the light most favorable to the defendant and accepts factual allegations as true). Applying these principles, the relevant facts are as follows.

### Background

As alleged in the counterclaims "Dorel is one of the world's leading juvenile products companies," and manufactures "juvenile vehicle seats" among other products. (Counterclaims (Docket No. 58) ¶ 1). At issue in this litigation is Dorel's "Air Protect® technology" which, by early 2009, was incorporated into juvenile car seats that were marketed and sold exclusively at Babies R Us. (Id. ¶ 3). According to Dorel, it filed its first patent application that included this technology, which was described as "an energy-dissipation system for use in a juvenile vehicle

[2]

seat," on July 30, 2008. (Id. ¶ 2). It is Cozy's contention that Dorel developed its technology by hiring away Cozy's engineer, Dr. Rajiv Menon. It is Dorel's contention that after learning about Dorel's technology, Dr. Rajasingham went to great lengths by, among other things, filing and amending various patents and patent applications with the United States Patent and Trademark Office ("PTO") in order to establish an earlier date for Cozy's patents, and to have its patents applied to child seats, which would then enable it to claim that Dorel infringed on its patents. While Cozy admits to a rather convoluted patent history for its patents, it contends that it was due to Dr. Rajasingham's inexperience in the world of patents. As detailed below, this dispute is not appropriately resolved at the motion to dismiss stage.

### The Patent Applications

As alleged in the counterclaims, in or about May 2009, Dr. Rajasingham visited Dorel for the purpose of interesting Dorel in alternative child seat technology. (Id. ¶ 5). According to Dorel, Dr. Rajasingham's ideas related to technology disclosed in other patents (not asserted here) which Dorel did not believe were feasible. (Id. ¶¶ 6-7). Dorel disclosed its own Air Protect® technology to Dr. Rajasingham at this meeting. (Id. ¶ 8).

On July 14, 2009, Dr. Rajasingham filed Provisional Patent Application No. 61,270,808 (the "July 2009 Application"). (Id. ¶ 9). A provisional application is filed to establish an early effective filing date for use in a later filed non-provisional patent application. (Id. ¶ 11). Although he had filed a number of patents and applications with the PTO before, the July 2009 Application was the first time that Dr. Rajasingham had "described, disclosed, or sought to patent an air cushion system in a child seat that remotely resembles the patent claims of the '298 and '739 Asserted Patent claims." (Id. ¶¶ 9-10). Dorel contends that the act of filing the

July 2009 Application confirms that Dr. Rajasingham and Cozy knew that there was no earlier support for their later patent claims.  (Id. ¶ 11).

In 2013, Dr. Rajasingham again reached out to Dorel, "ostensibly seeking collaboration on child seat technology."  (Id. ¶ 12).  Conversations continued as late as mid-2015, at which time Cozy's counsel made a presentation to Dorel asserting that Dorel was infringing the '835 and '416 Asserted Patents.  (Id.).  Dorel denied any infringement and Cozy did not pursue any infringement claims.  (Id. ¶ 13).  Instead, according to Dorel, Dr. Rajasingham filed two additional patent applications – the '932 Application on January 20, 2015, which eventually issued as the '298 Asserted Patent, and the '575 Application on September 9, 2015, which eventually issued as the '739 Asserted Patent.  (Id. ¶ 14).  These patent applications form the basis of Dorel's second counterclaim for inequitable conduct.

In these patent applications, Dr. Rajasingham did not claim priority back to the July 2009 Application, but, rather, sought priority back to, among others, Patent Application No. 09/435,080 (the "1999 Application").  (Id. ¶ 16).  According to Dorel, Dr. Rajasingham knew that he was not entitled to a priority date of 1999.  (Id. ¶ 17).  Rather, Dr. Rajsingham allegedly misrepresented to the PTO the substance of the 1999 Application, claiming that it described an air cushion system in a child seat, which it did not.  (Id. ¶ 18).  He also inconsistently argued that his 1999 Application, which did not show a child seat, should be understood as relating to a child seat, while also arguing that "multiple pieces of prior art" were distinguishable because they "only disclosed adult seats, not child seats."  (Id. ¶ 22).  As Dorel alleged further:

> To add to the confusion, despite a portfolio including vast subject matter unrelated to the '932 and '575 Applications, Dr. Rajasingham filed an Application Data Sheet that included nearly his entire portfolio of patents and applications.  This filing was part of an intentional plot to avoid the fact that Dr. Rajasingham did not have a pending patent

[4]

application with subject matter in common with the 1999 Application that would give him a priority date to pre-date, among other prior art, Dorel's technology. (Id. ¶ 23).

Dorel has alleged that further evidence of Dr. Rajasingham's bad faith can be found in his "kitchen-sink approach" and the inconsistent positions he took with the PTO at various times. (Id. ¶ 24). For example, at one point in 2015 Dr. Rajasingham took the position that the '932 Application had a priority date of September 1997 and would therefore expire in "just a few months." (Id. ¶ 26). When the PTO rejected his request for an expedited review of the '932 Application, he dropped the 1997 priority date and returned to a 1999 date, which would extend the term of the patent. (Id. ¶ 27). In 2016, a patent Examiner informed Dr. Rajasingham that he did "not agree that (the 1999 Application) discloses how such an airbag can be used with the removable child seat." (Id. ¶ 31). In response, and despite having earlier taken the position that adult seats were distinguishable from child seats, in 2017, Dr. Rajasingham amended his specifications and for the first time disclosed an adaptation of his adult seat to a child seat. (Id. ¶¶ 28-33). "Ultimately," Dorel alleges, "despite multiple objections to Dr. Rajasingham's submissions of new drawings and new clarifications to be added to the specification, Dr. Rajasingham convinced the USPTO that his disclosure of an adult safety harness and a child seat was sufficient to allow the '575 Application to issue as the '739 Patent." (Id. ¶ 33). Despite all of these communications, Dr. Rajasingham never disclosed Dorel's Air Protect® technology to the PTO. (Id. ¶ 34).

### The Certificates of Correction

Dorel also alleges facts relating to Dr. Rajasingham's filing of multiple "Certificates of Correction" in or around 2016 as evidence that he engaged in fraud on the PTO in order to

[5]

obtain a 1999 priority date. Thus, Dorel has described the steps taken by Dr. Rajasingham to "correct" patent applications which did not have early priority dates in order to claim a priority date of 1999, which predated Dorel's technology. (See id. ¶¶ 35-39). In connection with each filing, Dr. Rajasingham represented that "his 'mistakes' related to his priority claims 'were made in good faith and without deceptive intent'" which Dorel claims was false. (Id. ¶¶ 40-41). Simultaneously, according to Dorel, Dr. Rajasingham took steps to eliminate a 1997 priority date that he had originally asserted, since such a date would have left Cozy "with almost no patent term to assert infringement by Dorel." (Id. ¶¶ 42-43). The Application Data Sheet filed by Dr. Rajasingham included the representation that his "delay between the date the claim was due (regarding priority) and the date the claim was filed was unintentional." (Id. ¶ 44). Dorel again alleges that this representation was false. (Id. ¶ 45).

Despite knowing about Dorel's technology since at least 2009, Cozy did not commence the instant action for patent infringement until 2021.

### The Counterclaims

Dorel has brought two counterclaims based on inequitable conduct. The "First Count" alleges "a pattern and practice of misrepresentations to the USPTO" and relates to all the Asserted Patents. (Id. ¶¶ 46-72). The "Second Count" alleges a "failure to disclose prior and intervening art" and relates to the '298 and '739 Asserted Patents. (Id. ¶¶ 73-81). Specifically, Dorel describes its counterclaims as follows:

> The first count focuses on material affirmative representations Dr. Rajasingham made to the PTO (Counterclaims ¶¶ 47-72.) For example, Dr. Rajasingham submitted knowingly false statements to the PTO regarding the priority date while he was prosecuting two of the Asserted Patents – the '298 and '739 Asserted Patents. (Id. ¶¶ 14-34.) Further, he filed Certificates of Correction ("CoCs") and/or Application Data Sheets ("ADSs") for the two other Asserted Patents (i.e., the '416 and '835 Asserted Patents) as well as

> numerous other patents within the purported priority chain. (Id. ¶¶ 35-45.) These submissions contained further false statements regarding priority, which he made – not because of good faith "mistakes" or as a result of "unintentional delay" as Dr. Rajasingham represented to the PTO – but to maximize the value of the Asserted Patents for licensing discussions, and ultimately this litigation, with Dorel. (Id.)
>
> Dorel's second inequitable conduct count concerns Dr. Rajasingham's knowing failure to disclose material prior art during prosecution of the '298 and '739 Asserted Patents. (Id. ¶¶ 74-81.) More particularly, Dorel alleges that Dr. Rajasingham made "pervasive misstatements to the PTO" regarding priority that enabled him to "conceal multiple pieces of prior art that were material to patentability, including but not limited to dozens of Dr. Rajasingham's earlier patents and applications, the 2009 Application, Dorel's Air Protect® technology, and Dorel's patents covering its Air Protect® technology." (Id. ¶ 77.)

("Opposition to Plaintiff Cozy, Inc.'s Motion to Dismiss Defendant's Counterclaims" (Docket No. 84) ("Opposition") at 2-3 (form of record citations modified) (internal footnote omitted)).

Fundamentally, these counterclaims are all based on actions taken by Cozy/Dr. Rajasingham in filings with the PTO which resulted in Cozy being able to claim a patent date many years before the date the applications for the Asserted Patents were actually filed, lengthened the terms of the Asserted Patents, and which resulted in patents being read to cover child seats which, at a minimum, were not the primary focus of the patents.[2] Dorel, relying in part on the timing of Dr. Rajasingham's filings, argues that Dr. Rajasingham was motivated by an intent to cover Dorel's patents and create a conflict with Dorel's technology. Cozy argues that these were legitimate interactions with the PTO.

As detailed below, resolution of this dispute will have to await further development of the record.

---

[2] Nothing herein shall be read as an indication of the court's interpretation of the patent language that it is considering in connection with other pending motions.

[7]

### III.  ANALYSIS

**A.  Elements of an Inequitable Conduct Defense**

"Applicants for patents are required to prosecute patent applications in the PTO with candor, good faith and honesty."  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995) (internal footnote omitted).  "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent."  Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011).  It is a "judge-made doctrine" that evolved from "Supreme Court cases that applied the doctrine of unclean hands to dismiss patent cases involving egregious misconduct[.]"  Id. (and cases cited).  The remedy of rendering a patent (and potentially other related patents and applications in the same technology family) unenforceable has been described as the "atomic bomb" of patent law, since a finding of inequitable conduct cannot be cured.  Id. at 1288.  As a result, in Therasense, the court "tightened the inequitable conduct standard to ensure that the defense is sustained only in egregious circumstances and to discourage parties from using it as a mere litigation tactic in garden-variety cases."  Lexington Luminance LLC v. Osram Sylvania Inc., 972 F. Supp. 2d 88, 91 (D. Mass. 2013) (citing Therasense, 649 F.3d at 1288-91).

"The substantive elements of inequitable conduct are: (1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) the individual did so with a specific intent to deceive the PTO."  Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1327 n.3 (Fed. Cir. 2009).  "Intent and materiality are separate requirements, and both must be proven independently to establish inequitable conduct."

Capella Photonics, Inc. v. Infinera Corp., No. 2:20-CV-00077-JRG, 2021 WL 765084, at *2 (E.D. Tex. Feb. 26, 2021) (citing Therasense, 649 F.3d at 1290).

"Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent."  Molins PLC, 48 F.3d at 1179.  In Therasense, the court held that in making "this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction."  649 F.3d at 1291-92.  The Therasense court held further that "but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct" although there is an exception for "cases of affirmative egregious misconduct" which do not require such proof.  Id. at 1292.  Thus, "[w]hen the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material" without further evidence.  Id.

With respect to the intent requirement, the Therasense court explained as follows:

> A district court should not use a "sliding scale," where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. Moreover, a district court may not infer intent solely from materiality. Instead, a court must weigh the evidence of intent to deceive independent of its analysis of materiality. Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive. *See Star [Scientific, Inc. v. R.J. Reynolds Tobacco Co.],* 537 F.3d 1357, 1366 (Fed. Cir. 2008) ("the fact that information later found material was not disclosed cannot, by itself, satisfy the deceptive intent element of inequitable conduct").
>
> Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.,* 559 F.3d 1317, 1340 (Fed.Cir.2009). However, to meet the clear and convincing evidence standard, the specific intent to deceive must be "the single most reasonable inference able to be drawn from the

[9]

> evidence." *Star,* 537 F.3d at 1366. Indeed, the evidence "must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances." *Kingsdown [Med. Consults., Ltd. v. Hollister Inc.],* 863 F.2d 867, 873 Fed. Cir. 1988) (emphasis added). Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp.,* 528 F.3d 1365, 1376 (Fed.Cir.2008) ("Whenever evidence proffered to show either materiality or intent is susceptible of multiple reasonable inferences, a district court clearly errs in overlooking one inference in favor of another equally reasonable inference.").

Therasense, 649 F.3d at 1290-91.

### B. Pleading Requirements

Federal Circuit law applies in determining whether a defense of inequitable conduct is pleaded with sufficient particularity in a patent case. Petedge, Inc. v. Fortress Secure Sols., LLC, Civil Action No. 15-11988-FDS, 2016 WL 407065, at *3 (D. Mass. Feb. 2, 2016) (citing Exergen, 575 F.3d at 1326) (additional citation omitted)).  Prior to Therasense, in which the court made it more difficult to prove a claim of inequitable conduct, the Federal Circuit had decided Exergen, which detailed the standard for pleading claims of inequitable conduct.  Exergen, 575 F.3d at 1326-27.  The parties agree that, with respect to pleading, the standard set forth in Exergen and not Therasense applies.  (See "Plaintiff Cozy, Inc.'s Reply in Support of Its Motion to Dismiss Defendant's Counterclaims" (Docket No. 92) ("Cozy Reply") at 5).  See also Illumina Inc. v. BGI Genomics Co., Ltd., No. 20-cv-01465-WHO, 2021 WL 428632, at *4 (N.D. Cal. Feb. 8, 2021) ("the Therasense standard does not apply at the pleading stage").  "Under Exergen, a party's pleading 'must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentations, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO."  Id.  It does not, however, have to meet the Therasense

[10]

standard of intent.  Id. (while pleading did not allege conduct that met the standard for specific intent set forth in Therasense, motion to dismiss nevertheless denied as pleadings were sufficient to establish plausible inferences of specific intent to deceive).

Pursuant to Exergen, inequitable conduct must be plead with particularity in accordance with Fed. R. Civ. P. 9(b).  Exergen, 575 F.3d at 1326.  "[I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."  Id. at 1327.  Moreover, while intent and state of mind "may be averred generally" under Rule 9(b), the pleading must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."  Id.  As detailed below, Dorel has satisfied these pleading requirements.

    C. **Sufficiency of the Allegations**

In the instant case, Cozy does not dispute that the counterclaims sufficiently allege the "who, what, when, where, and how" of the misrepresentations or omissions before the PTO on which Dorel is relying.  The history of Dr. Rajasingham's interactions with the PTO on which Dorel bases its claims, and the statements Dorel is challenging, are clearly identified.  Rather, Cozy argues that Dorel has not established either that any of the misrepresentations were actually false or material, or that Dr. Rajasingham acted with the intent to deceive the PTO.  While Cozy has established that there are a number of facts in dispute, such disputes do not warrant dismissal of the counterclaims.  Rather, they warrant further discovery.

[11]

1. **Falsity of the Statements**

As an initial matter, Cozy argues that Dorel has failed to plead sufficient facts to support its contention that the statements made by Dr. Rajasingham to the PTO were false. (See Cozy Reply at 3-4). This court disagrees and finds the allegations sufficient to survive the motion to dismiss.

Cozy argues that there is no evidence that Dr. Rajasingham misrepresented the priority dates of the Asserted Patents. (Id. at 2). Admittedly, the merits of Cozy's position as to the appropriate priority dates may not be determined until the litigation is resolved. However, in light of the various positions taken by Dr. Rajasingham throughout the course of his interactions with the PTO, there are sufficient facts from which the court can infer that at least some of his representations as to the appropriate priority date were false. As detailed above, it is alleged that Dr. Rajasingham asserted priority dates of 2009, 1997 and 1999 for substantially the same technology. Superimposing such representations over the chronology of Cozy's interactions with Dorel supports an inference (discussed more fully below) that Cozy's representations were done with the intent to deceive the PTO, cover Dorel's technology, and hide Dorel's technology as prior art.

For the same reasons, there are sufficient allegations to support the conclusion that Dr. Rajasingham made false representations intentionally, and that his delay in correcting his filings was not the result of good faith "mistakes" or "unintentional delay." The fact that the amendments and corrections took place over almost a decade, allegedly involved inconsistent representations to the PTO, and coincided with unsuccessful efforts to enter into business ventures with Dorel is sufficient at the pleading stage to support an inference that Dr.

Rajasingham's claims of mistake and/or unintentional delay were false. See Finjan, 2019 WL 330912, at *5-6 (filing by patent holder of multiple petitions of delayed claims of priority calls into question patent holder's contention that the failure to previously assert priority claim was "unintentional").

Cozy asks "what if Dr. Rajasingham's statements are *not* false?  What if he was *not* engaging in a years-long elaborate scheme to defraud the Patent Office?" (Cozy Reply at 1 (emphasis in original)).  Cozy asks this court to compare Dorel's pleadings with two cases, Finjan and Intellect Wireless, Inc. v. HTC Corp., where the courts considered various facts in concluding that false statements had been made. (Cozy Reply at 3-4).  If anything, these cases prove the need for further discovery.   For example, in Intellect Wireless, 732 F.3d 1339 (Fed. Cir. 2013) the court found patents unenforceable due to inequitable conduct after consideration of the facts developed during a bench trial.  In Finjan, the court refused to strike an affirmative defense of inequitable conduct, relying, in part, on discovery from other court cases submitted by the defendant in support of its finding that false representations had been made. Finjan, 2019 WL 330912, at *6.  These cases point to the fact that the development of the factual record is critical, and that the motion to dismiss should be denied.

2. **Materiality**

**"Egregious Misconduct"**

Dorel contends that it does not have to establish "but-for" materiality because it has pleaded that Cozy committed "egregious acts of misconduct" "by engaging in a pattern and practice of making false statements to the PTO." (Opposition at 5).  Cozy argues that Dorel has not asserted the "extraordinary circumstances" that "fall into this narrow exception" to the

[13]

requirement that a defendant must establish "but-for" materiality.  (Cozy Reply at 5).  This court finds the pleadings sufficient to state a claim of egregious acts of misconduct.

In Therasense, the court held that but-for materiality need not be established "[w]hen the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit[.]"  Therasense, 649 F.3d at 1292.  On the other hand, "neither mere nondisclosure of prior art references to the PTO nor failure to mention prior art references in an affidavit constitutes affirmative egregious misconduct, [and] claims of inequitable conduct that are based on such omissions require proof of but-for materiality."  Id. at 1292-93.  In the instant case, Dorel has alleged that Dr. Rajasingham made numerous affirmative misrepresentations to the PTO, and that over the course of many years took many steps in many forms to re-interpret his patents to cover child car seats, and to establish a priority date which pre-dated Dorel's technology.  The merits of these allegations will have to be established after further development of the record.  The allegations are sufficient, however, to state a claim of egregious misconduct.  See Finjan, 2019 WL 330912, at *5-6 (and cases cited).

### "But-for Materiality"

The allegations of the counterclaims are sufficient in any event to state a claim that "but-for" the misrepresentations and omissions, the Asserted Patents would not have issued.  Many courts have recognized that "a priority claim is inherently material as it determines what may be considered prior art and what may not."  Asghari-Kamrani v. United Servs. Auto. Assoc., 252 F. Supp. 3d 562, 574 (E.D. Va. 2017).  Significantly, it is Cozy's contention that Dorel's technology, which had been on the market since 2009, infringes on the Asserted Patents.  "A

[14]

century-old axiom of patent law holds that a product 'which would literally infringe if later in time anticipates if earlier.'"  Upsher-Smith Labs., Inc. v. Pamlab, L.L.C., 412 F.3d 1319, 1322 (Fed. Cir. 2005) (quoting Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1379 (Fed. Cir. 2003) (additional citations omitted)).  There can be no question that if Dr. Rajasingham's patents did not, in fact, have a priority date earlier than 2009, the Dorel technology should have been disclosed as material to the issuance of Dr. Rajasingham's patents.  See Aventis Pharma S.A. v. Hospira, Inc., 675 F.3d 1324, 1334 (Fed. Cir. 2012) (when a claim is invalidated based on a "deliberately withheld reference, then that reference is necessarily material for [the] purposes of the inequitable conduct inquiry.") (internal quotations omitted).  Cozy's response, that the priority date of 1999 was true, will have to await further development of the record.  In sum, the allegations are sufficient to support the materiality prong of the inequitable conduct defense.

### 3. Intent to Deceive

The chronology of events pleaded by Dorel colors, and supports, the allegation that Dr. Rajasingham acted with the requisite intent to deceive the PTO about the scope of his existing patents, the priority date, and the existence of prior art.  As alleged, Dr. Rajasingham knew about Dorel's allegedly infringing technology by no later than 2009.  It was not until 12 years later, in 2021, that Cozy first brought suit, despite having had access to patent counsel in the intervening years.  Instead of taking any steps to stop Dorel's alleged infringement (with a product that apparently has been openly and successfully marketed throughout the years), it is alleged that Dr. Rajasingham devoted his energy to convincing the patent office to change the priority date he had originally asserted, and to change the description of his patents to

expressly cover Dorel's product – child seats. His efforts began shortly after his first meeting with Dorel and continued through his last attempts to enter into a business arrangement with the company. It is further alleged that while pursuing these efforts, Dr. Rajasingham made inconsistent statements to the PTO about, *inter alia*, priority dates and whether technology relating to an adult seat was applicable to a child seat. From this chronology one can infer that Dr. Rajasingham believed he did not have sufficient grounds to sustain a claim of patent infringement without modifying his patent portfolio in significant ways, and that his interactions with the PTO were designed to accomplish that goal. There is enough at the pleading stage to support the reasonable inference that he was acting with the intent to capture Dorel's technology, as well as with the intent to avoid having to disclose such technology as prior art, and in so doing to deceive the PTO. See Illumina, 2021 WL 428632, at *4 (pleading contained sufficient allegations of underlying facts to support a plausible inference that patent holders knew of and intentionally withheld relevant reference with the intent to deceive the PTO).

The facts as alleged are sufficient to support an inference that Dr. Rajasingham knew that the priority date was of critical importance to his relationship with Dorel, and knew that he was making misrepresentations about the appropriate priority date. For example, but without limitation, it is alleged that Dr. Rajasingham first disclosed to the PTO in his July 2009 Application his intent to file a patent application covering an air cushion system in a child seat. According to Dorel, the act of filing the 2009 Application confirms that Dr. Rajasingham knew

that there was no prior support for any such patent claims.[3]  Nevertheless, in 2015, after years of discussions with Dorel proved unsuccessful,[4] Dr. Rajasingham claimed that his existing patents disclosed such technology as early as 1997.  Then when the PTO declined to consider his request for an expedited review of the '932 Application which contained that priority date, he changed the priority date to 1999.  These inconsistent positions about information within Dr. Rajasingham's knowledge and control calls into question the veracity of his statements to the PTO.  Viewing Dr. Rajasingham's actions in conjunction with his continued discussions with Dorel, there are sufficient facts for the court to infer that Dr. Rajasingham acted with Dorel's technology in mind, and with the requisite intent to deceive the PTO.  See Finjan, 2019 WL 330912, at *5 (facts supported a reasonable inference that patent holder's efforts to modify priority date were motivated by its attempt to maximize its value in business negotiations and to deceive the PTO).

Finally, Dorel has alleged sufficient facts to support its contention that Dr. Rajasingham acted with the requisite intent to deceive when he made (mis)representations to the PTO in connection with his argument that his patents covered child seats.  According to Dorel, Dr. Rajasingham took the position with the PTO in his 1999 Application that an adult seat encompassed a child seat, while inconsistently arguing that multiple pieces of prior art were

---

[3] For its part, Cozy claims that "Dr. Rajasingham filed the 2009 Application as protection, more than anything else." (Cozy Mem. at 5, n.2).  Dorel is entitled to explore this assertion through discovery.

[4] Cozy argues that one of its PTO filings was made in January 2015, before its conversations with Dorel ended, and thus cannot be considered as evidence of an intent to deceive.  (Cozy Mem. at 5-6). However, discussions with Dorel had been going on since 2013 and ended in March 2015.  It is reasonable to infer that by January 2015, Cozy was aware that it would be unable to enter into a business arrangement with Dorel.

distinguishable because they only addressed adult seats and not child seats.  Dr. Rajasingham allegedly continued to modify the description of his technology until at least 2017, even though the technology was allegedly reflected in a patent dating back to 1997.  Such a need for constant modification and explanation supports the inference that such actions were undertaken with the specific intent to cover Dorel's technology, and to deceive the PTO into believing that there was no relevant prior art.

"[T]he intent to deceive must be 'viewed in light of all the evidence. . . .  Intent need not, and can rarely be, proven by direct evidence.  Rather, intent to deceive is generally inferred from the facts and circumstances surrounding the applicant's overall conduct.'"  Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc., 606 F.3d 1353, 1362 (Fed. Cir. 2010) (quoting Impax Labs., Inc. v. Aventis Pharms., Inc., 468 F.3d 1366, 1374-75 (Fed. Cir. 2006)).  Given the need to evaluate the facts and circumstances of each case in order to draw the requisite inference, the issue of deceptive intent is rarely appropriate even for summary judgment proceedings.  See Arrow Int'l, Inc. v. Spire Biomedical, Inc., 635 F. Supp. 2d 46, 59 (D. Mass. 2009) (citing KangaROOS U.S.A., Inc. v. Caldor, Inc., 778 F.2d 1571, 1577 (Fed. Cir. 1985)).  See also Leviton, 606 F.3d at 1363.  In the instant case, Dorel has alleged sufficient facts to warrant development of the record beyond the motion to dismiss stage.

Cozy offers various alternative explanations of Dr. Rajasingham's conduct, which may eventually prove persuasive.  However, none of the arguments preclude a finding of intent to deceive as a matter of law, and all simply highlight the need for discovery.  For example, Cozy argues that this court should consider Dr. Rajasingham's *pro se* status, and that, as a result, "specific intent to deceive is no[t] plausible" "even if Dr. Rajasingham made decisions that other

patent attorneys would not have made, or made mistakes as a matter of patent practice[.]" (Cozy Mem. at 14-15).  However, *pro se* status alone does not shield a patent applicant from a finding of inequitable conduct.  See Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd., 204 F.3d 1368, 1376 (Fed. Cir. 2000) (court finds inventor's testimony about his intent not to be credible).  See also Am. Calcar, Inc. v. Am. Honda Motor Co., 768 F.3d 1185, 1191 (Fed. Cir. 2014) (after bench trial, court found that the argument that patent holder's "inexperience may have contributed to a mistaken or accidental failure to disclose" "was unsupported by the evidence."  Finding that he acted with specific intent to deceive the PTO affirmed on appeal). Cozy also argues that Dr. Rajasingham "reasonably" believed that Dorel's technology was not prior art, and "reasonably" believed that the PTO was aware of his other patents.  (Cozy Mem. at 15).  Dorel is entitled to explore these beliefs in discovery.  Moreover, the fact that the PTO may have been aware of other patents does not automatically shield Dr. Rajasingham from liability.  A "lapse on the part of the examiner does not excuse the applicant. . . .  There is no reprieve from the duty of square dealing and full disclosure that rests on the patent practitioner in dealings with the PTO."  Arrow Int'l, Inc., 635 F. Supp. 2d at 63.  Similarly, "burying" patents in lists of non-relevant patents can be found to be inequitable conduct.  See Molins PLC, 48 F.3d at 1183.

Cozy also disputes Dorel's description of its first meeting with Cozy in May 2009 and asks this court to consider "key parts of the story" that "Dorel left out[.]"  (Cozy Mem. at 5). The need to rely on such extraneous evidence makes the need for discovery clear.  In sum, none of the arguments raised by Cozy preclude a finding of inequitable conduct as a matter of

[19]

law. "[Cozy's] counterarguments speak to the weight of the evidence and are not appropriate or persuasive at this [motion to dismiss] stage in the litigation." Finjan, 2019 WL 330912, at *6.

## IV. CONCLUSION

For all the reasons detailed herein, "Plaintiff Cozy, Inc.'s Motion to Dismiss Defendant's Counterclaims" (Docket No. 70) is DENIED.

                                                                  / s / Judith Gail Dein
                                                                   Judith Gail Dein
                                                                   United States Magistrate Judge