UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COZY, INC.,                                    )
                                               )
                    Plaintiff,                 )
                                               )
           v.                                  )        CIVIL ACTION NO. 21-10134-JGD
                                               )
DOREL JUVENILE GROUP, INC.,                    )
                                               )
                    Defendant.                 )


## MEMORANDUM OF DECISION AND ORDER
## ON ISSUES OF CLAIM CONSTRUCTION

November 9, 2022

DEIN, U.S.M.J.

### I. INTRODUCTION

Cozy, Inc. ("Cozy") is a company owned by Dr. Arjuna Rajasingham. Dr. Rajasingham is the holder of numerous patents relating to safety systems in vehicles designed to protect occupants in the event of a collision. The defendant, Dorel Juvenile Group, Inc. ("Dorel"), is a manufacturer of juvenile products, including child seats for use in vehicles. Since early 2009, Dorel's child seats have incorporated its "Air Protect® technology." By this action, Cozy contends that Dorel's Air Protect® technology infringes on four of its patents, all of which claim a priority date of 1999 due to their relationship to U.S. Patent No. 6,609,749 (the '749 Patent), which was applied for in 1999 and issued on August 26, 2003.[1] The '749 Patent has expired. It

---

[1] For present purposes, Dorel has adopted Cozy's priority date of 1999, without waiver of its contention that "many of the terms in the patent claims are unsupported by the 1999 application on which Cozy/Dr. Rajasingham rely." (Dorel's Opening Claim Construction Brief ("Dorel Opening Br.") (Docket No. 66) at 1 n.2).

is Dorel's contention, which Cozy strenuously denies, that after obtaining the '749 Patent, "Dr. Rajasingham's goal was to draft patent claims – not to cover *his* invention – but to try to cover Dorel's technology." (Dorel Opening Br. at 1 (emphasis in original)).

This matter is presently before the court on the parties' request that the court construe claims in the four Cozy patents, namely:

- US 7,156,416 (the '416 Patent) issued on January 2, 2007 (See Docket No. 1-6)

- US 8,136,835 (the '835 Patent) issued on March 20, 2012 (See Docket No. 1-5)

- US 9,669,739 (the '739 Patent) issued on June 6, 2017 (See Docket No. 1-4)

- US 9,902,298 (the '298 Patent) issued on February 27, 2018 (See Docket No. 1-3)

(collectively the "Asserted Patents").

In the parent '749 Patent and each of the Asserted Patents, Dr. Rajasingham begins his "detailed description of invention" as follows:

> The present invention provides a passenger vehicle a structure that synergistically incorporates two functions. First, during lateral or side impacts, a means to decouple from impact, and protect passengers while projecting the remaining mass of the vehicle to decelerate the impacting body, and second, utility to passengers and drivers, in mounting and dismounting the vehicle with the comfort of contoured surround seats. The arrangement may in some embodiments use an indo-skeletal beam that allows such embodiments to rely on compressive force transmission to transfer impact energy to the mass of the vehicle rather than shear loads that are required in the shell paradigm of construction in most current passenger vehicles.

('749 Patent col. 9 ll. 49-61; '416 Patent col. 9 l. 61 - col. 10 l. 6; '835 Patent col. 11 ll. 31-43; '739 Patent col. 9 ll. 38-50; '298 Patent col. 12 ll. 35-47). The '749, '416 and '835 Patents are entitled "Easy Ejector Seat with Skeletal Crash Safety Beam" and the '739 and '298 Patents are entitled "Vehicle Occupant Support."

The claims the court is being asked to construe are described in a chart entitled "Revised Exhibit A." (See Docket No. 103-1). A Markman hearing was held in accordance with Markman v. Westview Instruments, Inc., 517 U.S. 370, 372, 116 S. Ct. 1384, 1387, 134 L. Ed. 2d 577 (1996). After consideration of the pleadings[2] and arguments of counsel, the court construes the claims as described herein and in Attachment A hereto.

## II. STANDARD OF REVIEW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is a matter of law for the court. Markman, 517 U.S. at 372, 116 S. Ct. at 1387; SafeTCare Mfg., Inc. v. Tele-Made, Inc., 497 F.3d 1262, 1268 (Fed. Cir. 2007).

Under ordinary principles of claim construction, the court must give the words of the claim "their ordinary and customary meaning[,]" that is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1312-13 (quotations and citations omitted). This inquiry is an objective one, which "is based on the well-settled

---

[2] The relevant pleadings are Cozy's Opening Claim Construction Brief ("Cozy Opening Br.") (Docket No. 64); the Declaration of Richard Kent, Ph.D. in Support of Plaintiff Cozy, Inc.'s Opening Claim Construction Brief ("Kent Decl.") (Docket No. 65); Dorel Opening Br. and exhibits attached to the declaration of counsel ("Dorel Ex. ___") (Docket No. 67); Dorel's Responsive Claim Construction Brief ("Dorel Resp. Br.") (Docket No. 95); Cozy's Responsive Claim Construction Brief ("Cozy Resp. Br.") (Docket No. 96); Cozy's Notice of Supplemental Material in Support of its Markman Briefing ("Cozy Suppl. Mem.") (Docket No. 117); Dorel's Memorandum in Response to Plaintiff Cozy, Inc.'s Notice of Supplemental Material in Support of its Markman Briefing ("Dorel Suppl. Resp.") (Docket No. 119); and the parties' Markman presentations to the court.

understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Id. at 1313. Because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent," the court must look at the ordinary meaning in light of the patent specification and the prosecution history. Id. (and cases cited).

In some instances, ascertaining the ordinary and customary meaning of the claim language will require "little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful." Id. at 1314 (internal citation omitted). However, where interpretation of the claim language, as understood by a person of ordinary skill in the art at the time of the invention, is not so apparent, "the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. (internal quotations and citations omitted). See also PC Connector Sols. LLC v. SmartDisk Corp., 406 F.3d 1359, 1362 (Fed. Cir. 2005) ("In interpreting claims, a court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history.") (internal quotation and citation omitted)). The prosecution history may "limit[] the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." Sky Techs., LLC v. Ariba, Inc., 491 F. Supp. 2d 154, 156 (D. Mass. 2007) (quoting

[4]

Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995)).  Moreover,

"[w]hen multiple patents derive from the same initial application, the prosecution history

regarding a claim limitation in any patent that has issued applies with equal force to

subsequently issued patents that contain the same claim limitation."  Elkay Mfg. Co. v. Ebco

Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999).

While on occasion "extrinsic evidence in the form of expert testimony can be useful to a

court for a variety of purposes, such as to provide background on the technology at issue, to

explain how an invention works, to ensure that the court's understanding of the technical

aspects of the patent is consistent with that of a person of skill in the art, or to establish that a

particular term in the patent or the prior art has a particular meaning in the pertinent field[,]"

such evidence is generally considered "less reliable because it 'is generated at the time of and

for the purpose of litigation and thus can suffer from bias that is not present in intrinsic

evidence.'"  SkinMedica, Inc. v. Histogen Inc., 727 F.3d 1187, 1195 (Fed. Cir. 2013) (quoting

Phillips, 415 F.3d at 1318).

Since "claim terms are normally used consistently throughout the patent, the usage of a

term in one claim can often illuminate the meaning of the same term in other claims."  Phillips,

415 F.3d at 1314.  Moreover, since a claim does not stand alone but rather is part of a

document "consisting principally of a specification that concludes with the claims," id. at 1315,

as a general rule,"the specification 'is always highly relevant to the claim construction analysis.

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  Id.

(quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  As detailed

below, however, in the instant case the specifications have proved less helpful than one would expect.[3]

It is well-recognized that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."  Id. at 1316.  Similarly, "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor.  In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive."  Id.  See also SkinMedica, Inc., 727 F.3d at 1196 (and cases cited).  Thus, "[d]isclaiming the ordinary meaning of a claim term – and thus, in effect, redefining it – can be affected through repeated and definitive remarks in the written description."  Id. (internal quotation and citation omitted).

"A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date."  PC Connector Sols. LLC, 406 F.3d at 1363.  "[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing."  Kopykake Enters., Inc. v. Lucks Co., 264 F.3d 1377, 1383 (Fed. Cir. 2001).

_____

[3] The specifications of the Asserted Patents have made the claim construction analysis especially challenging in this case.  Although they are helpful in some instances, each of the specifications also includes figures, detailed descriptions of the invention and numerous embodiments that are not directly related to the invention recited in the claims.  Additionally, the preferred embodiments, and most of the alternative embodiments, provide little if any insight regarding the meaning and scope of the claim terms.  For example, but without limitation, the '416 Patent claims "[a]n Air Cushion System for protecting at least one protected entity, from impact from an impacting object[.]"  However, the preferred embodiment set forth in the specification does not purport to describe the components of an Air Cushion System or how it functions.  Nor does it adopt any of the language used in the claims.  These issues, along with the length and detail of the specifications, have made it challenging to link the descriptions to the specific claims and to rely with any regularity on the specifications to guide this court's findings as to the meaning of disputed terms.

Finally, Dorel has argued that certain claims must fail for indefiniteness.

"[I]ndefiniteness is a question of law and in effect part of claim construction." ePlus, Inc. v.

Lawson Software, Inc., 700 F.3d 509, 517 (Fed. Cir. 2012). A "claim is indefinite if its language

might mean several different things and no informed and confident choice is available among

the contending definitions." Media Rights Techs., Inc. v. Capital One Fin. Corp., 800 F.3d 1366,

1371 (Fed. Cir. 2015) (internal quotation and citation omitted). Thus, a claim is "invalid for

indefiniteness if its language, when read in light of the specification and the prosecution

history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the

invention." Id. (internal punctuation, quotation, and citation omitted).

### III.  CLAIM CONSTRUCTION ANALYSIS

Revised Exhibit A initially included fifteen different claim terms, or groups of claim

terms, requiring construction. However, the parties have been able to resolve their differences

and reach an agreement on construction with respect to four of the listed terms. As a result,

this court's analysis only addresses the eleven claim terms, or groups of claim terms, that

remain in dispute. For the reasons detailed below, this court finds that those terms should be

defined as follows.

### 1. "Prefilled" and "Being filled"

The parties' first dispute concerns the word "prefilled," as used in claim 1 of the '298

Patent, claim 1 of the '739 Patent and claim 1 of the '835 Patent, and the phrase "being filled,"

as used in claim 1 of the '416 Patent. Cozy contends that these terms do not need construction

and should be given their plain and ordinary meaning, whereas Dorel proposes a construction

that defines both "prefilled" and "being filled" to mean "having been filled in advance." (Cozy

Opening Br. at 5; Dorel Opening Br. at 14).  "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Here, the parties dispute whether Dorel's proposed construction improperly adds ambiguity to the claims of the asserted patents "by requiring action to occur." (See Cozy Opening Br. at 6).  Accordingly, this court must resolve the dispute and construe the claim terms at issue.  See O2 Micro Int'l, 521 F.3d at 1362 ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").  Because this court finds that Dorel's definition is consistent with the plain and ordinary language of the disputed terms and the intrinsic evidence, this court adopts Dorel's proposed construction.

Claim 1 of the '298 Patent is representative of the use of the term "prefilled" in the claims of the Asserted Patents.  It describes the invention, in relevant part, as follows:

1. A child seat for use in a vehicle comprising:

a first airbag configured to protect an occupant during side impact to the vehicle, *prefilled* with air supplemented with a porous filling material within...

wherein said first airbag *pre-filled* with air and with said porous filling material comprising a foam pad within is enabled to cushion an occupant ahead of impact to the vehicle ….

('298 Patent col. 24 ll. 6-9, 23-26 (emphasis added)).  Claim 1 of the '416 Patent, which is the only claim at issue containing the phrase "being filled," provides in relevant part:

The invention claimed is:

> 1.  An Air Cushion System for protecting at least one protected entity, from impact from an impacting object comprising: ...
>
> b) at least one sacrificial chamber located in a predetermined position within said impacted structure, such that said impact from impacting object, will compress said sacrificial chamber, said sacrificial chamber *being filled* with a compressible fluid at the time of said impact ....

('416 Patent col. 21 ll. 11-14, 16-21 (emphasis added)).  It is undisputed that "prefilled" and "being filled," as used in the Asserted Patents, should have the same meaning.  (See Revised Exhibit A).   It is also undisputed that these terms should be given their ordinary meaning, although the parties do not agree on the words Dorel proposes to describe that meaning.  (See Cozy Opening Br. at 5-6; Dorel Opening Br. at 15).  While Dorel argues that "'[p]refilled' ... indicates that an action has taken place, i.e., the airbag has been filled by someone or something[,]" Cozy contends that Dorel's proposed construction "adds ambiguity to the claim by requiring action to occur."  (Dorel Opening Br. at 16; Cozy Opening Br. at 6).  Cozy further argues that "there is no reason to construe [the] terms beyond [their] plain and ordinary meaning because the meaning is clear from the intrinsic record."  (Cozy Resp. Br. at 2).  Thus, according to Cozy, "[t]he plain language states that the airbag contains the air and porous filling material and thus is described as 'prefilled.'"  (Id. at 3).

The dictionary defines the word "prefilled" as "filled in advance."  *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/prefilled (last visited Nov. 8, 2022).  Applying this definition in the context of the relevant claims means that the "airbag" of the '298, '739 and '835 Patents was previously filled with air and a porous filling material, and that the "sacrificial chamber" of the

'416 Patent was previously filled with compressible fluid.[4]   This is consistent with Dorel's

proposed definition of "having been filled in advance."   It is also consistent with the

prosecution history of the '835 Patent.

> Specifically, the record shows that claim 1 of the '835 Patent originally recited
>
> [a]n airbag *configured to maintain* at least a predetermined volume of air with porous filling materials, and comprising vents for exhaust at a metered rate during impact, said porous filling materials and vents, enabling adjustment of the compression characteristics of the airbag under impact, thereby providing protection of an occupant in a vehicle under impact conditions.

(Dorel Ex. 9 at 93 (emphasis added)).   After the patent examiner rejected the claim on the

grounds that it was obvious in light of the airbags of Auman and Brown, Dr. Rajasingham

amended claim 1 of the '835 Patent to replace the phrase "configured to maintain" with the

words "prefilled with," the language contained in the claims that ultimately issued.   (Id.).   He

also argued that the '835 Patent was not obvious as amended because Brown did not teach an

airbag with porous filling materials and because "the porous material of Auman is introduced

into the airbag <u>following</u> commencement of the impact with foam material that is compressed

and maintained <u>outside</u> the airbag ahead of deployment."   (Id. (emphasis added)).   Thus, Dr.

Rajasingham distinguished his invention from the prior art on the grounds that air and porous

filling materials had been introduced to his airbag at an earlier time—i.e, in advance.

As described above, Cozy argues that Dorel's proposed construction is improper

because it requires action to occur.   Specifically, Cozy contends that "[t]he Asserted Claims are

all apparatus or system claims" and "[i]t is improper to use claim construction to add action to

---

[4] As discussed *infra*, the parties have asked the court to define the term "airbag" and Dorel has asked the court to define the term "sacrificial chamber."

such claims, which instead is typically reserved for method claims."  (Cozy Opening Br. at 6).

While the Federal Circuit has held that a claim is indefinite where it recites "both an apparatus

and a method of using that apparatus[,]" Dorel's construction does not recite a method of using

the system or apparatus described in the asserted claims.  See IPXL Holdings, L.L.C. v.

Amazon.com, Inc., 430 F.3d 1377, 1384 (Fed. Cir. 2005).  It merely indicates that the act of

filling the airbag or sacrificial chamber took place at an earlier time.

It is undisputed that Dorel's construction involves action, albeit action that previously

occurred.  However, this does not mean that Dorel is seeking to add action to the asserted

claims.  The only way an object can be filled in advance, or at any time, is if someone or

something engaged in the act of filling it.  Under Dorel's construction, this action has already

been completed and no further action is necessary.  Because Dorel's proposed construction of

"prefilled" and "being filled" is consistent with the plain and ordinary meaning of the terms as

used in the Asserted Patents, this court will adopt it.

### 2. "Airbag"

The parties' next dispute concerns the construction of the term "airbag," as it is used in

claim 1 of the '298 Patent, claim 1 of the '739 Patent and claim 1 of the '835 Patent.  The

disputed term appears as follows in claim 1 of the '835 Patent:

The invention claimed is:

**1.** An *airbag* prefilled with at least a predetermined volume of air with porous filling materials, and comprising vents for exhaust at a metered rate during impact, said porous filling materials and vents, enabling adjustment of the compression characteristics of the *airbag* under impact, thereby providing protection of an occupant in a vehicle under impact conditions.

('835 Patent col. 44 ll. 46-53 (emphasis added)).  Claim 1 of the '739 Patent is also

representative of the use of the term "airbag" in the '298 Patent.  It provides in relevant part as

follows:

> The invention claimed is:
>
> A child seat for use in a vehicle comprising:
>
> a first *airbag* configured to protect an occupant during side impact to the vehicle, prefilled with air supplemented with a porous filling material within, and having a plurality of vents, configured to evacuate said air at a controlled rate upon impact during side impact to the vehicle;
>
> wherein said first *airbag* pre-filled with air and with said porous filling material within is enabled to cushion the passenger ahead of impact ...
>
> and wherein said supplementary porous filling material within and plurality of vents enable adjustment of compression characteristics during impact of said first *airbag* to protect the occupant under side impact conditions to the vehicle.

('739 Patent col. 21 ll. 17-37 (emphasis added)).

<u>Cozy's Request to Amend its Proposed Construction of "Airbag"</u>

As set forth in Revised Exhibit A, the parties initially agreed that the airbag claimed in

the Asserted Patents constituted a type of "chamber," with Cozy proposing a construction that

would define "airbag" to mean a "vented deflatable chamber" and Dorel proposing a

construction that would define an "airbag" to mean "a single chamber that retains a

determinable volume of air."   (Revised Exhibit A).  However, after the <u>Markman</u> hearing took

place, Cozy submitted a Notice of Supplemental Material in Support of its <u>Markman</u> Briefing by

which it sought to add to the record the original, November 8, 1999 application (the "1999

Application") for the '749 Patent and to substitute the word "cushion" for the word "chamber"

[12]

in its proposed claim constructions.  (<u>See</u> Cozy Suppl. Mem. at 2-3).  For the reasons that follow, both of Cozy's requests are denied.

Cozy argues that the original claims of the '749 Patent are part of the intrinsic record that the court should consider during claim construction.  (<u>Id.</u> at 1).  Accordingly, although neither party included the 1999 Application in its original rounds of briefing, Cozy is now asking this court to consider the 1999 Application, which ultimately led to the issuance of the '749 Patent, in connection with its claim construction analysis.  Dorel argues that if Cozy is permitted to enter the 1999 Application into the record, it also should be required, pursuant to Rule 106 of the Federal Rules of Evidence,[5] to enter the entire prosecution history for that Patent.  (Dorel Suppl. Resp. at 2).  As Dorel's argument indicates, the 1999 Application is only part of the prosecution history of the '749 Patent and provides only a snapshot from the prosecution file.  Consequently, it would not be appropriate to consider the Application outside the context of the complete file.  In any event, this court finds that it is neither necessary nor appropriate to review the prosecution history of the '749 Patent at this juncture in the litigation.  This court has not been asked at this stage to construe any of its claim terms.  Additionally, the parties' dispute as to whether the 1999 Application establishes a priority date for the claims of the Asserted Patents is not an issue that is presently before the court.  Accordingly, there is no reason for Cozy to submit the prosecution history for the '749 Patent, and Cozy's request that this court consider the 1999 Application is denied.

---

[5] Rule 106 of the Federal Rules of Evidence provides: "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."

With respect to Cozy's proposal to substitute the word "cushion" for the word "chamber" in its claim construction proposals, Cozy contends that this change is necessary because it has become apparent that the parties have differing interpretations of the word "chamber" and "adopting either [party's] construction using that word would not resolve the dispute about claim scope." (Cozy Suppl. Mem. at 1). Dorel counters that Cozy's alternative constructions are still incorrect, and that substituting "cushion" for "chamber" will only result in additional confusion. (Dorel Suppl. Resp. at 1, 5). For the reasons that follow, this request is denied as well.

This court finds, as an initial matter, that Cozy's request is untimely. Cozy did not file the instant Notice of Supplemental Material until over three months after the parties filed their responsive claim construction briefs and two days after the completion of the Markman hearing. Its effort to make new changes at this stage in the claim construction process simply comes too late.

Additionally, Cozy's attempt to use a single word to avoid a dispute about claim scope will not achieve that result. As described in detail below, the Patents at issue use different terms, including "airbag," "sacrificial chamber" and "air cushion(s)," to describe the functions of the airbags used in the inventions. Cozy's proposed use of "cushion" rather than "chamber" will do little to define these claim terms or resolve the parties' differences regarding the construction of these terms. For this reason as well, its request is denied. The court will consider the disputed claim terms as originally requested, based on the applicable claim construction standards.

<u>Whether the Airbag is Vented</u>

As described above, Cozy initially asked this court to construe the term "airbag," as used in claim 1 of the '298, '739 and '835 Patents, as a "vented deflatable chamber."  Dorel contends that the term should be construed as "a single chamber that retains a determinable volume of air" and objects to a definition that includes the word "vented."  (<u>See</u> Revised Exh. A; Dorel Opening Br. at 10).  This court finds that neither proposal is entirely accurate, and that the proper construction of "airbag" is "a single, vented, deflatable chamber."

Each of the claims at issue expressly describes the airbag as vented.  Claim 1 of the '739 Patent and claim 1 of the '298 Patent both describe "a first airbag configured to protect an occupant during side impact to the vehicle, ... and having a *plurality of vents* configured to evacuate said air at a controlled rate ...."  ('739 Patent col. 21 ll. 19-23 (emphasis added); '298 Patent, col. 24 ll. 7-11 (emphasis added)).  Claim 1 of the '298 Patent further describes the "plurality of vents" as part of the structure of the airbag.  (<u>See</u> '298 Patent col. 24 ll. 13-18 (describing "airbag" as being "constructed with a flexible membrane adjoining [a] foam pad" with a "plurality of vents compris[ing] perforations on said flexible membrane")).  Similarly, claim 1 of the '835 Patent discloses "[a]n airbag ... comprising vents for exhaust at a metered rate during impact ...."  ('835 Patent col. 44 ll. 47-49).  "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention."  <u>Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega Sys., LLC</u>, 350 F.3d 1327, 1338 (Fed. Cir. 2003) (internal quotations, punctuation and citation omitted) (quoting <u>Interactive Gift Express, Inc. v.</u>

Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001)).  Therefore, the independent claims of the relevant Patents specifically require that the airbag be vented.

Dorel argues that any such construction is erroneous because the specifications make almost no mention of vented airbags.  (Dorel Opening Br. at 10).  A review of the specifications reveals that there are no references to vents in the preferred embodiments of the '739, '298 and '835 Patents.  (See '739 Patent col. 10-13; '298 Patent col. 13-16; '835 Patent col. 12-15).  Ordinarily, "[a] claim construction that excludes a preferred embodiment is rarely, if ever correct and would require highly persuasive evidentiary support."  Kaufman v. Microsoft Corp., 34 F.4th 1360, 1372 (Fed. Cir. 2022) (quoting Epos Technologies Ltd. v. Pegasus Technologies Ltd., 766 F.3d 1338, 1347 (Fed. Cir. 2014)).  However, in the instant case, none of preferred embodiments describe the inventions claimed specifically in the Asserted Patents.  Rather, the claimed inventions are described in one of the alternative embodiments.  In the case of the '298, '739 and '835 Patents, each of the specifications includes an alternative embodiment that incorporates the vented airbag described in claim 1 of the Patent.  (See '739 Patent col. 19 ll. 15-18 (describing embodiment using "supplementary porous filling materials *within prefilled internal airbags designed with suitable vents* to change the compression characteristics of the inside airbags under impact." (emphasis added)); '298 Patent col. 22 ll. 15-18 (same); '835 Patent col. 36 ll. 1-4 (same)).  Therefore, this court concludes that that an "airbag" must be vented.[6]

---

[6] To the extent Dorel argues that the airbag cannot be vented because "[t]here is no disclosure in Cozy's priority document of an airbag that vents in the vicinity of an occupant's head and neck[,]" its argument is unpersuasive for purposes of construing the Asserted Patents.  (See Dorel Resp. Br. 3).  The '749 Patent is not one of the Patents-in-Suit and this court has not been asked to construe its terms. While the '749 Patent is part of the intrinsic record and may assist the court in construing the claim

<u>Number of Chambers</u>

The parties also dispute whether the airbag must consist of a single chamber or whether it may consist of multiple chambers.  Cozy argues that the specifications of the '298, '739 and '835 Patents provide "specific embodiments of the invention that include one or more sacrificial chambers within the airbag" and disclose "multiple chambers in a single airbag." (Cozy Opening Br. at 8 (emphasis omitted)).  Therefore, Cozy contends that it would be improper to limit the airbag to a single chamber.  (<u>Id</u>.).  However, Dorel disputes that anything in the Asserted Patents discloses the structure of an airbag with multiple chambers, and it argues that the claims pertaining to the airbag acting as a "sacrificial chamber" disclose "a single sacrificial chamber as constituting an airbag."  (Dorel Resp. Br. at 4).  It further argues that Dr. Rajasingham disclaimed an airbag with multiple chambers during the prosecution of the '416 Patent, and that an "airbag" must be comprised of a single chamber for this reason as well.  (Dorel Opening Br. at 8).  Because this court finds that Dr. Rajasingham clearly disclaimed an airbag with multiple chambers when he distinguished his invention from the prior art during prosecution of the '416 Patent, this court finds that the airbag must be limited to a single chamber.

This court notes, as an initial matter, that there is no language in claim 1 of the '298, '739 or '835 Patents to suggest that the airbag disclosed therein must be limited to a single

terms in dispute, Dorel's reliance on that Patent does not address the clear references to vents in the Asserted Patents.  The question whether the differences between the '749 Patent and the later Asserted Patents defeat the claimed 1999 priority date is not presently before the court.

chamber.  (See '298 Patent col. 24 ll. 6-41; '739 Patent col. 21 ll. 18-37; '835 Patent col. 44 ll. 47-

53).  Additionally, as Cozy argues, the Patent specifications describe an embodiment having

> *external airbags* constructed using the Passive Air-Cushion System *with micro
> chambers* that are connected to each other by restricted paths that provide visco-
> elastic energy absorption in the event of some sections of the airbag being
> impacted while others are not, thereby forcing air from the compressed micro
> chambers to the other micro chambers, each of the micro chambers functioning
> as either a sacrificial chamber or a Micro Air Cushion on impact.

(See, e.g., '298 Patent col. 21 ll. 30-38 (emphasis added)).  Therefore, the Patent descriptions

appear to support the use of airbags having an undefined number of "micro chambers" rather

than one undivided chamber.  On the other hand, each of the Patents contains a dependent

claim in which the airbag of claim 1 "act[s] as a *sacrificial chamber*" that releases or transfers air

to one or more air cushions.  (See '298 Patent col. 24 ll. 55-59 (claiming "[t]he child seat of

claim 1, enabled to utilize impact energy of an inertial loading on the first airbag to cause first

airbag to act as a sacrificial chamber" that "is connected to transfer air to inflate an air-

cushion"); '739 Patent col. 21 ll. 51-55 (same); '835 Patent col. 44 ll. 54-56 (reciting "[a]n airbag

as in claim 1, wherein said airbag acts as a sacrificial chamber to release airflow ... to

aircushions")).  Thus, the language of the dependent claims suggests that the airbag of claim 1

constitutes a single chamber.

Even assuming Cozy's reading of the Patents is correct, controlling authority provides

that "[s]tatements made during prosecution which clearly disclaim a particular claim

interpretation will limit the scope of the claims."  ACCO Brands v. Micro Sec. Devices, Inc., 346

F.3d 1075, 1078 (Fed. Cir. 2003).  During prosecution of the '416 Patent, Dr. Rajasingham

distinguished his invention from U.S. Patent No. 6,059,311, which discloses a single airbag with

two chambers -- an upper chamber and a lower chamber – by explaining that his invention

[18]

claimed "*a distinct and separate sacrificial chamber* and one or more micro air cushions connected together by fluid paths[.]"  (Dorel Ex. 6 at 139 (emphasis added)).   Because the airbag of claim 1 of the '298, '739 and '835 Patents acts as the "sacrificial chamber" for purposes of the invention, Dr. Rajasingham's argument clearly disclaimed an airbag having multiple chambers.  Consequently, this court concludes that the "airbag" disclosed in claim 1 of the relevant Patents must consist of a single chamber.

<u>Whether the Chamber is Deflatable or Retains a Determinable Volume of Air</u>

The parties also dispute whether the airbag disclosed in the independent claims of the three Patents must be "deflatable" or whether it "retains a determinable volume of air."  This court finds that each of those Patents discloses a deflatable airbag.  Both the '298 Patent and the '739 Patent disclose "a first airbag ... prefilled with air supplemented with a porous filling material within, and having a plurality of vents configured to *evacuate* said air at a controlled rate upon impact[.]"  ('298 Patent col. 24 ll. 6-11 (emphasis added); '739 Patent col. 21 ll. 18-23 (emphasis added)).  Claim 1 of the '835 Patent similarly discloses "[a]n airbag prefilled with at least a predetermined volume of air with porous filling materials, and comprising vents for *exhaust* at a metered rate during impact[.]"  ('835 Patent col. 44 ll. 47-49 (emphasis added)).  Accordingly, each of the Patents claims an airbag that empties or discharges air.  See *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/evacuate (defining "evacuate" as "to remove the contents of: EMPTY"); https://www.merriam-webster.com/dictionary/exhaust (defining "exhaust" in this context as "to draw off or let out completely" and describing it as synonymous with "DISCHARGE, EMPTY") (last visited Nov. 8, 2022).  This is equivalent to an airbag that is able to

deflate and is thus deflatable.  See id. at https://www.merriam-webster.com/dictionary/deflate

(defining "deflate" to mean: "to release air or gas from") (last visited Nov. 8, 2022).

The claims pertaining to the use of the airbag as a "sacrificial chamber" support this

court's conclusion that the airbag is deflatable.  Specifically, claim 2 of the '835 Patent describes

"[a]n airbag as in claim 1," which "acts as a sacrificial chamber to *release* airflow following

commencement of compression of said airbag to aircushions[.]"  ('835 Patent col. 44 ll. 54-56

(emphasis added)).  Similarly, claim 6 of the '298 Patent and claim 7 of the '739 Patent describe

"[t]he child seat of claim 1, enabled to utilize impact energy of an inertial loading on the first

airbag to cause first airbag to act as a sacrificial chamber ... wherein the first airbag is

connected to transfer air to inflate an air cushion[.]"  ('298 Patent col. 24 ll. 55-59; '739 Patent

col. 21 ll. 50-55).  Accordingly, those claims describe an airbag, which has been prefilled with air

and is capable of releasing air, *i.e.*, deflating, in order to transfer air to air cushions.[7]

Finally, this court finds that Dorel's proposed construction of an airbag as a chamber

that "retains a determinable volume of air" does not appropriately describe the airbag

disclosed in the Asserted Patents.  While the Patents describe an airbag that is "prefilled" with

air, nothing in claim 1 of the Patents addresses the retention of air or requires the airbag to

---

[7] Cozy also relies on the deposition testimony of its expert, Dr. Richard Kent, to support its argument that the "airbag" disclosed in claim 1 of the '298, '739 and '835 Patents are "deflatable."  (Cozy Resp. Br. at 3-4).  While "extrinsic evidence in the form of expert testimony can be useful" in the context of claim construction, this court finds that Dr. Kent's testimony provides little if any clarification on this issue. See SkinMedica, Inc., 727 F.3d at 1195.  During his testimony, Dr. Kent pointed to Figure 12H3 of the '298 Patent as a "good example" of airbags that are vented and deflatable.  (Cozy Resp. Br., Ex. 1 at 78). However, Figure 12H3 depicts "micro air cushions" that are labeled as being "vented."  (See '298 Patent Fig. 12H3 & col. 12 ll. 8-18).  As described below, it is undisputed that the "micro air cushions" disclosed in the Asserted Patents are distinct from the "airbag" described in claim 1 of the '298, '739 and '835 Patents.  Because it appears that Dr. Kent failed to make this distinction during his deposition, this court finds it would not be appropriate to rely on his testimony on this point.

maintain a volume of air that is "determinable."  On the contrary, as described above, those claims disclose the evacuation or exhaustion of air from the airbag upon or during impact.  (See '298 Patent col. 24 ll. 7-12; '739 Patent col. 21 ll. 19-24; '835 Patent col. 44 ll. 47-51).  In other words, the Asserted Claims emphasize the release, rather than the retention, of air from the airbag.

Dorel's reliance on the prosecution history of the '416 Patent does not warrant a different conclusion.  Specifically, Dorel argues that

> [i]n trying to overcome the prior art, Dr. Rajasingham distinguished his purported invention over the rejection on the basis of U.S. Patent No. 6,059,311, in which there was simple flow between two chambers as a result of a vent, or a hole, in a common wall and differential pressure as between the two chambers.  Here, Dr. Rajasingham specifically noted that his invention did "not allow such flexibility in deployment."  This lack of flexibility is reflected in the claim construction Dorel puts forward, which defines the airbag as a chamber that retains a determinable volume of air.

(Dorel Opening Br. at 9).  However, the record reveals that in trying to overcome the prior art of Patent No. 6,059,311, Dr. Rajasingham argued that it was the prior art (rather than his invention) which lacked the flexibility of deployment that was present in his invention.  (See Dorel Ex. 6 at 139 (describing the direction of deployment of the micro air cushions in Cozy's invention and arguing that "[t]he topology of ... US 6,059,311 will not allow such flexibility in deployment").  Therefore, the record undermines Dorel's argument for a claim construction that reflects the "lack of flexibility" described during prosecution.  For purposes of this litigation, the "airbag" limitation of claim 1 of the '298, '739 and '835 Patents shall mean "a single, vented, deflatable chamber."

[21]

### 3. "Sacrificial Chamber"

The third claim term at issue is the "sacrificial chamber" disclosed in claim 6 of the '298 Patent, claim 7 of the '739 Patent, claim 2 of the '835 Patent and claim 1 of the '416 Patent. Dorel argues that a "sacrificial chamber" should be construed to mean "a chamber that sacrifices its enclosed fluids to air cushion(s)" while Cozy contends that "sacrificial chamber" should be read in accordance with its plain and ordinary meaning and that no construction is necessary.  (See Revised Exhibit A; Cozy Opening Br. at 9).  Cozy further challenges Dorel's proposed construction on the grounds that it is confusing, unnecessarily adds "air cushion" as a limitation without support in the intrinsic record, and would result in an improper narrowing of the claims.  (Cozy Opening Br. at 9-10; Cozy Resp. Br. at 6).  This court is obliged to resolve the parties' dispute and "determine the proper construction of this claim term in the first instance[.]"  O2 Micro Int'l, 521 F.3d at 1362-63.  For the reasons that follow, this court construes a "sacrificial chamber" to mean "a chamber that sacrifices its enclosed fluids."

As detailed above, claim 6 of the '298 Patent, claim 7 of the '739 Patent and claim 2 of the '835 Patent disclose the airbag of independent claim 1 acting as a "sacrificial chamber" that releases or transfers air to air cushions.  Claim 7 of the '739 Patent is representative of these claims and provides as follows:

> The child seat of claim 1, enabled to utilize impact energy of an inertial loading on the first airbag to cause first airbag to act as a *sacrificial chamber*, to protect a predetermined region of the occupant wherein the first airbag is *connected to transfer air to inflate an air cushion* located in a vicinity of the predetermined region for protection of the occupant with a support surface of said air cushion.

('739 Patent col. 21 ll. 51-57 (emphasis added)).  Similarly, claim 1 of the '416 Patent, which discloses an "Air Cushion System," describes the function of a "sacrificial chamber" upon impact as follows:

> The invention claimed is:
>
> 1. An Air Cushion System for protecting at least one protected entity, from impact from an impacting object comprising:
>
> a) an impacted structure comprising said protected entity;
>
> b) at least one *sacrificial chamber* located in a predetermined position within said impacted structure, such that impact from impacting object, will compress said *sacrificial chamber*, said *sacrificial chamber being filled with a compressible fluid* at the time of said impact;
>
> c) at least one elongate fluid path, each with first and second spaced apart end, and each comprising flow control mechanisms, that is connected to said *sacrificial chamber* at its first end, *and filled with said compressible fluid,* such that *under impact to the sacrificial chamber, said fluid paths conduct a predetermined controlled volume of said compressible fluid out of said sacrificial chamber* to predetermined locations away from said *sacrificial chamber*;
>
> d) one or more micro-air cushions placed in predetermined locations and supported by said impacted structure, said micro-air cushions being connected to said at least one fluid path at its second end, thereby receiving predetermined controlled volumes of said compressible fluid from said fluid paths at and immediately following said impact;
>
> *thereby said sacrificial chamber inflating said micro-air cushions* in predetermined directions unrelated to the direction of compression of said *sacrificial chamber* by transferring fluid from the first end of said at least one fluid path, to the second end of said at least one fluid path and protecting said protected entity.

('416 Patent col. 21 ll. 11-43 (emphasis added)).   Thus, the plain and ordinary language of the disputed claims supports a construction of the "sacrificial chamber" as "a chamber that sacrifices its enclosed fluids" by transferring the air or compressible fluid contained therein to air cushions.  However, it is not necessary for purposes of claim construction to include the

words "to air cushion(s)" as Dorel proposes because the terms "air cushion" and "micro-air cushions" pertain to components of the claimed inventions that are connected to but not a part of the "sacrificial chamber."  Furthermore, the parties have asked that these terms be construed as well, so linking them to the definition of "sacrificial chamber" would merely cause confusion.

The Patent descriptions provide further support for this construction of a "sacrificial chamber."  Specifically, each of the Patent specifications describes an embodiment implementing a "Passive Air Cushion System that uses the pressure in one or more sacrificial chambers which under pressure transfer air to one or more micro-air cushions that protect high priority anatomical regions."  ('298 Patent col. 19 ll. 15-19; '739 Patent col. 16 ll. 16-20; '835 Patent col. 30 ll. 38-42; '416 Patent col. 16 ll. 35-39).  As the specifications explain in relevant part:

> [i]n this embodiment, *the passive anatomical micro air cushion (131), derives it[s] inflation source from the sacrificial chamber (139)* at the lower end of the shield of the safety harness, that is compressed by a much greater body mass under impact.  In a frontal collision *the force of the more massive parts of the body on the sacrificial chamber will deploy the passive anatomical micro-air cushions* to protect the face and the neck ... Under side impact the passive anatomical head and neck micro-air cushions deploy to protect the head and neck under relative lateral acceleration.  Notably the *passive anatomical head and neck micro-air-cushions can be actively deployed or as in this embodiment passively deployed by a discharge of air from sacrificial chambers* between the seats or on the outer surface of the seats and mounted on each of the seats, so that lateral pressure will inflate the anatomical head and neck micro-air-cushions.

('298 Patent col. 19 ll. 19-27, 55-64 (emphasis added); '739 Patent col. 16 ll. 20-28, 56-65 (emphasis added); '835 Patent col. 30 ll. 42-49, col. 31 ll. 11-19 (emphasis added); '416 Patent col. 16 ll. 39-47; col. 17 ll. 8-17 (emphasis added)).  Accordingly, the specifications emphasize the function of the sacrificial chamber as the inflation source for the micro-air cushions by way

of the discharge of air out of the sacrificial chamber to the micro-air cushions.  This function is appropriately captured by this court's definition of a "sacrificial chamber."

Cozy argues that it is unhelpful to use the terms "sacrifices" and "chamber" to define a "sacrificial chamber."  (Cozy Opening Br. at 9).  This court finds this argument unpersuasive.  As an initial matter, the parties' understanding of "chamber" is demonstrated by their original agreement to use that term as a means to define the airbag disclosed in claim 1 of the '298, '739 and '835 Patents.  It is that same airbag which acts as the "sacrificial chamber" disclosed in the dependent claims of the Patents.  Moreover, the use of the terms "sacrifices" and "chamber" is effectively the same as Cozy's proposal to apply the plain and ordinary meaning to the claim term "sacrificial chamber," which is simply a chamber that gives up, or "sacrifices," its fluids to air cushions.  See *Merriam-Webster.com Dictionary,* Merriam-Webster, https://www.merriam-webster.com/dictionary/sacrificial (defining "sacrificial" to mean "of, relating to, of the nature of, or involving sacrifice"), https://www.merriam-webster.com/dictionary/sacrifice (defining the verb "sacrifice" to mean "1: to offer as a sacrifice" or "2: to suffer loss of, give up, renounce, injure, or destroy especially for an ideal, belief, or end") (last visited Nov. 8, 2022).  Furthermore, as detailed above, the use of these words is consistent with the specifications' teachings regarding the function of a sacrificial chamber.  Therefore, this court concludes that the "sacrificial chamber" of claim 6 of the '298 Patent, claim 7 of the '739 Patent, claim 2 of the '835 Patent and claim 1 of the '416 Patent means "a chamber that sacrifices its enclosed fluids."

## 4. "Air Cushion" and "Micro Air-Cushion"

The parties have also asked the court to resolve their differences regarding the construction of "air cushion(s)," as used in claim 6 of the '298 Patent, claim 7 of the '739 Patent and claim 2 of the '835 Patent, and the construction of "micro-air cushion(s)," as used in claim 1 of the '416 Patent.  Cozy proposes a construction that would define an "air cushion" and a "micro-air cushion" as a "breathable inflatable chamber."  (Revised Exhibit A).  Dorel has asked for a construction that would define these terms as "a chamber separate from the sacrificial chamber and inflatable at or immediately following impact."  (Id.).  This court concludes that it is appropriate to construe the terms "air cushion(s)" and "micro-air cushion(s)" to mean "inflatable cushion(s)."

This court notes at the outset that the intrinsic evidence draws a distinction between a "sacrificial *chamber*" and an "air *cushion*" or "micro-air *cushion*."  As detailed above, the claims of each of the Asserted Patents describe a system in which a "sacrificial chamber" releases or transfers fluid to "air cushions" or "micro-air cushions" that are configured to protect an occupant during impact.  Similarly, the Patent specifications describe embodiments in which airbags function as either a "sacrificial chamber" that sacrifices its enclosed fluids to "air cushions" or an "air cushion" that receives fluids from a "sacrificial chamber."  (See, e.g., '298 Patent col. 19 l. 4 – col. 20 l. 22; col. 21 l. 30 – col. 22 l. 2).  Dr. Rajasingham also distinguished his invention from the prior art by describing the function of the "sacrificial chamber" as the inflation source for secondary "air cushions."  (Dorel Ex. 6 at 164-65).  Because the intrinsic evidence demonstrates that the distinction between the two structures is significant, to avoid

confusion this court finds that the terms "air cushion(s)" and "micro-air cushion(s)" should be referred to as "cushions" rather than "chambers" for purposes of claim construction.

It is undisputed that the air cushions disclosed in the specific claims at issue are "inflatable." (See Revised Exhibit A). This court agrees that such a construction is warranted. The relevant claims describe a system in which air or fluid from a sacrificial chamber is transferred to air cushions, which "inflate" to protect the occupant. (See, e.g., '739 Patent col. 21 ll. 51-57 (disclosing a "first airbag" acting as a "sacrificial chamber" that is "connected to transfer air to *inflate* an air cushion" (emphasis added)); '416 Patent col. 21 ll. 12-39 (describing the components and function of an "Air Cushion System," including a "sacrificial chamber *inflating* ... micro-air cushions" (emphasis added))). The Patent descriptions and prosecution history also support a construction that includes "inflatable" to define air cushions. (See, e.g., '298 Patent col. 19 ll. 15-23, 55-64 (describing embodiment in which air from sacrificial chambers inflates passive anatomical micro-air cushions); Dorel Ex. 6 at 164-65 (distinguishing present invention from prior art based on invention's use of a sacrificial chamber to "inflate" secondary air cushions)). Accordingly, this court adopts the parties' proposal to include the word "inflatable" in the definition of "air cushion(s)" and "micro-air cushion(s)."

Cozy argues that the air cushions should also be construed as "breathable" because the dissipation of air is necessary to absorb the force of an impact. (See Cozy Resp. Br. at 7). In particular, Cozy reasons that "[i]f such cushions were not 'breathable,' they could inflate to the point of rupture, which is antithetical to providing protection to a child under impact conditions." (Cozy Opening Br. at 10). However, Dorel counters that these concepts are not expressed in the Asserted Patents, which provide no basis for the inclusion of "breathable" in

[27]

the construction of "air-cushions."  (Dorel Opening Br. at 13-14; Dorel Resp. Br. at 5).  This court

agrees that there is no support for Cozy's proposed construction in the intrinsic record and that

a "breathable" limitation would be improper with respect to the air cushions disclosed in the

disputed claims.

None of the claims at issue refer to the air cushions as "breathable."  Nor do they

contain language supporting such a construction.  The plain and ordinary meaning of

"breathable" is "allowing air to pass through: POROUS."  *Merriam-Webster.com Dictionary,*

Merriam-Webster, https://www.merriam-webster.com/dictionary/breathable (last visited Nov.

8, 2022).  As Dorel asserts, however, no such concept is included in the relevant claims of the

Asserted Patents.  On the contrary, those claims describe the *inflation* of air cushion(s) or

micro-air cushion(s) via the transfer of fluids from a sacrificial chamber.  (See '298 Patent col. 24

ll. 55-62; '739 Patent col. 21 ll. 51-57; '835 Patent col. 54 – col. 57; '416 Patent col. 21 ll. 31-43).

In support of its argument that the air cushions are "breathable," Cozy relies on the

deposition testimony of its expert witness, Dr. Richard Kent.  (Cozy Resp. Br. at 7).  During his

deposition, Dr. Kent testified that a person of ordinary skill in the art reading the Patents

"would understand that the term airbag deflates.  It's vented, deflatable."  (Id., Ex. 1 at 77).

Focusing on the '298 Patent, Dr. Kent further explained in relevant part that

> there's discussion of dissipating energy.  An airbag can't dissipate energy if it
> doesn't deflate.  If it doesn't deflate, it will just store energy.  And that's – you
> know, engineers have that problem with air in an enclosed volume all the time,
> because it acts as a spring.
>
> And for occupant protection, you would want, if you're talking about energy being
> absorbed, you need flow to do that.  And so that, you know, that concept is
> throughout this patent.

> And even the term viscoelastic is used. That's an engineering term that requires energy dissipation. So if those airbags were not deflatable, if they were not venting, they would not be viscoelastic, they would be elastic. It's just – a person of ordinary skill would understand that.

(Id. at 78-79).

Dr. Kent's testimony is insufficient to support a construction that includes "breathable" for several reasons. First, it does not appear that Dr. Kent was distinguishing between the "airbag" disclosed in the independent claims of the '298, '739 and '835 Patents and the "air cushions" disclosed in the dependent claims of those Patents. As this court described above, the independent claims of those Patents specifically disclose an "airbag" that is both vented and configured to "evacuate" or "exhaust" air upon impact. Additionally, there is no evidence that Dr. Kent considered the claims at issue here. The parties have asked this court to construe the terms "air cushion(s)" and "micro-air cushion(s)" as they appear in claim 6 of the '298 Patent, claim 7 of the '739 Patent, claim 2 of the '835 Patent and claim 1 of the '416 Patent. There is no indication that Dr. Kent was asked to consider these specific claims in connection with his testimony. Furthermore, "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" Phillips, 415 F.3d at 1318 (quoting Key Pharms v. Hercon Labs. Corp., 161 F.3d 709, 716 (Fed. Cir. 1998)). Here, Dr. Kent's testimony is inconsistent with the language of the relevant claims, which lack any mention of vented or deflatable air cushions. Finally, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." Phillips, 415 F.3d at 1314-15. Because dependent claim 10 of the '416 Patent recites an air cushion system in which "at

least one of said sacrificial chamber *and micro air-cushions are vented*[,]" it is appropriate to conclude that the micro-air cushions disclosed in claim 1 of that Patent are neither vented nor "breathable." (See '416 Patent col. 22 ll. 50-53 (emphasis added)).

This court recognizes that during his deposition, Dr. Kent highlighted Figure 12H3 of the '298 Patent as "a good example where [airbags] are explicitly labeled as vented[.]" (Cozy Resp. Br., Ex. 1 at 78). As this court described in note 7 *supra*, Figure 12H3 depicts a safety harness containing micro-air cushions that are labeled as "vented." ('298 Patent Fig. 12H3; see also '298 Patent col. 12 ll. 8-18). Thus, it appears to show an embodiment of the invention in which the micro-air cushions include vents. Nevertheless, "[l]imitations from the specification ... cannot be imported into the claims[.]" 3M Innovative Props. Co. v. Avery Dennison Corp., 350 F.3d 1365, 1372 (Fed. Cir. 2003). Therefore, Figure 12H3 cannot rewrite the meaning of the air cushion(s) and micro-air cushion(s) of the disputed claims to add that they are breathable.

Finally, this court declines to adopt Dorel's proposal to define the air cushion(s) as "separate from the sacrificial chamber" and inflatable "at or immediately following impact" on the grounds that those limitations are unnecessary and inappropriate. The claims at issue describe the function of the sacrificial chamber vis-à-vis the air cushion(s), thereby making it clear that the air cushion(s) are distinct structures that are separate but connected to the sacrificial chamber. (See, e.g., '298 Patent col. 24 ll. 55-62 (describing the "first airbag" of claim 1 acting as a "sacrificial chamber" that "is connected to transfer air to inflate an air-cushion configured to be located in a vicinity of the predetermined region for protection of the occupant"); '416 Patent col. 21 ll. 12-43 (listing separate elements comprising an Air Cushion System, including but not limited to, "at least one sacrificial chamber[,]" "at least one elongate

fluid path, each with first and second spaced apart end" and "one or more micro-air

cushions[,]" and describing the "sacrificial chamber inflating said micro-air cushions ... by

transferring fluid from the first end of said at least one fluid path, [to which the sacrificial

chamber is connected] to the second end of said at least one fluid path" to which the micro-air

cushions are connected)).  Consequently, it would be redundant to construe the terms "air

cushion(s)" and "micro-air cushion(s)" as separate from the sacrificial chamber for purposes of

the asserted claims.  Similarly, both the '835 Patent and the '416 Patent include specific

language regarding the timing of inflation of the air cushions and micro-air cushions.  (See '835

Patent col. 44 ll. 54-57 (describing airbag of claim 1 acting as a "sacrificial chamber to release

airflow *following commencement of compression of said airbag* to air cushions" (emphasis

added)); '416 Patent col. 21 ll. 31-37 (describing micro-air cushions receiving compressible fluid,

and thereby inflating, "*immediately following ... impact*" (emphasis added))).  Therefore, it is

also unnecessary to include the phrase "at or immediately following impact" in the construction

of "air cushion(s)" and "micro-air cushion(s)."

### 5. <u>**"(Controlled) Rate," "(Metered) Rate" and "Flow Control"**</u>

The parties dispute the meaning of the phrases "(controlled) rate" as used in claim 1 of

the '298 and '739 Patents, "(metered) rate" as used in claim 1 of the '835 Patent, and "flow

control" as used in claim 1 of the '416 Patent.  Each of these references relates to the

evacuation of fluid and/or air from an airbag.[8]  Cozy contends that "rate" should be defined as

---

[8] It is undisputed that the term "fluid," as used in the '416 Patent, includes "air."  (See Dorel Opening
Br. at 19-20 (using "air" to refer to compressible fluid conducted out of the sacrificial chamber disclosed
in the '416 Patent); Cozy Resp. Br. at 11 (arguing that the intrinsic record relating to the '416 Patent

"release over time" and that "flow control" should be given its plain and ordinary meaning.

Dorel contends that these phrases should be defined as "a rate that is regulated as to when,

how much, and at what pressure."  For the reasons detailed herein, the court construes the

phrases "(controlled) rate" and "(metered) rate" under their plain and ordinary meaning to

mean "such that the velocity of the flow of air and/or liquid out of the airbag is regulated."  It

construes the phrase "flow control" mechanisms to mean mechanisms "that regulate the

velocity of the flow of fluid."

Claim 1 of the '298 Patent and claim 1 of the '739 Patent read in relevant part as

follows:

1. A child seat for use in a vehicle comprising:

[a] first airbag configured to protect an occupant during side impact to the vehicle, prefilled with air supplemented with a porous filling material within, and having a plurality of vents configured to evacuate said air *at a controlled rate* upon impact during side impact to the vehicle;

('298 Patent col. 24 ll. 6-12 (emphasis added); '739 Patent col. 21 ll. 18-24 (emphasis added)).

Claim 1 of the '835 Patent reads in relevant part as follows:

1. An airbag prefilled with at least a predetermined volume of air with porous filling materials, and comprising vents for exhaust *at a metered rate* during impact, said porous filling materials and vents, enabling adjustment of compression characteristics of the airbag under impact, thereby providing protection of an occupant in a vehicle under impact conditions.

('835 Patent col. 44 ll. 47-53 (emphasis added)).

---

"links the release of *air* out of the sacrificial chamber to its compression upon impact." (emphasis added)).

Claim 1 of the '416 Patent reads in relevant part as follows:

1. An Air Cushion System for protecting at least one protected entity, from impact from an impacting object comprising:

a) an impacted structure comprising said protected entity;

b) at least one sacrificial chamber located in a predetermined position within said impacted structure, such that said impact from impacting object, will compress said sacrificial chamber, said sacrificial chamber being filled with a compressible fluid at the time of said impact;

c) at least one elongate fluid path, each with first and second spaced apart end, *and each comprising flow control mechanisms*, that is connected to said sacrificial chamber at its first end, and filled with said compressible fluid, such that under impact to the sacrificial chamber, said fluid paths conduct a predetermined controlled volume of said compressible fluid out of said sacrificial chamber to predetermined locations away from said sacrificial chamber ....

('416 Patent col. 21 ll. 12-30 (emphasis added)).

Cozy contends that the claims require the metered or controlled release of air over time, so that air "does not escape like a popped balloon."  (Cozy Markman Presentation at 30). Thus, Cozy agrees that the air flow is regulated, and argues that "[i]n the context of the Asserted Patents, 'controlled' and 'metered' mean that the rate of air is mechanically influenced by a feature of the passive system, such as vents" or other "mechanical techniques." (Cozy Opening Br. at 11; Cozy Resp. Br. at 9).  Cozy provides no specific definition of the words "controlled" and "metered."  However, Cozy objects to Dorel's proposed construction on the basis that it "asks this Court to read in limitations of knowing 'when, how much, and at what pressure' of the fluid flow through the passive airbags."  (See Cozy Resp. Br. at 9).

Dorel counters that it "has not required a specific identification of these parameters" i.e., "'pressure,' 'when,' and 'how much.'"  (Dorel Resp. Br. at 7).  Rather, Dorel argues that the Patents teach that "the flow of air is regulated in terms of when it flows, how much it flows,

and at what pressure."  (Id.).  Thus, according to Dorel, "control of air in terms of time, amount, and pressure – by using valves, fluid paths, etc. – is necessary to achieve what Dr. Rajasingham described was critical to his invention."  (Id. at 8).

Dorel is correct that the claims purport to regulate various aspects of the flow of the contents out of airbags.  For example, claim 1 of the '298 Patent calls for the release of air from an airbag "upon impact during side impact to the vehicle" or "during transient inertial loading of the airbag by the occupant[.]" ('298 Patent col. 24 ll. 11-12, 27-28).  Claim 1, paragraph (c) of the '416 Patent calls for the release of "a predetermined controlled volume" of compressible fluid out of the sacrificial chamber "under impact to the sacrificial chamber" "to predetermined locations away from said sacrificial chamber[.]" ('416 Patent col. 21 ll. 26-30).  However, these teachings as to "when" and "how much" air is flowing are not included in the phrases "controlled rate" and "metered rate" that the court has been asked to construe.  Dorel has attempted to incorporate its understanding of the entirety of the patents into these discrete phrases.  The result is to misinterpret the plain and ordinary meaning of these specific terms.

The plain and ordinary meaning of "controlled" is "restrained," *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/controlled (last visited Nov. 8, 2022), and a synonym is "regulated."  *Merriam-Webster.com Thesaurus*, Merriam-Webster, https://www.merriam-webster.com/thesaurus/controlled (last visited Nov. 8, 2022).  The plain and ordinary meaning of "metered" is "to supply in a measured or regulated amount."  *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/meter (last visited Nov. 8, 2022).  "Rate" as used in connection with the movement of a fluid is commonly understood to mean "velocity."

[34]

(See Kent Decl. ¶ 48; *Merriam-Webster.com Dictionary*, Merriam-Webster,

https://www.merriam-webster.com/dictionary/velocity ("the rate of change of position along

a straight line with respect to time: the derivative of position with respect to time.") (last visited

Nov. 8, 2022)).  Thus, the velocity or speed with which air or fluid is evacuated from the airbags

is regulated.  There is no basis for adding other language about when, where, or under what

pressure the air is evacuated.

Giving the words their ordinary meaning, the reference to "flow control mechanisms" is

to the mechanical techniques used to regulate the evacuation of compressible fluid from the

sacrificial chamber.  ('416 Patent col. 21 ll. 12-30).  Consistently interpreting these Patents, the

aspect of flow that is being controlled is its velocity.  The fact that the flow consists of a

predetermined volume and is directed to a predetermined location is found in other parts of

claim 1 and these concepts do not need to be added to the definitions at issue.

### 6. "Elongate Fluid Path"

The parties next ask the Court to construe "elongate fluid path" as used in claim 1 of the

'416 Patent.  Specifically, the claim reads in relevant part as follows:

1. An Air Cushion System for protecting at least one protected entity, from impact
from an impacting object comprising:

a) an impacted structure comprising said protected entity;

b) at least one sacrificial chamber located in a predetermined position within said
impacted structure, such that said impact from impacting object, will compress
said sacrificial chamber, said sacrificial chamber being filled with a compressible
fluid at the time of said impact;

c) at least one *elongate fluid pa*th, each with first and second spaced apart end,
and each comprising flow control mechanisms, that is connected to said sacrificial
chamber at its first end, and filled with said compressible fluid, such that under
impact to the sacrificial chamber, said fluid paths conduct a predetermined

controlled volume of said compressible fluid out of said sacrificial chamber to predetermined locations away from said sacrificial chamber ....

('416 Patent col. 21 ll. 12-30 (emphasis added)).  Cozy defines the term "elongate fluid path"[9] as a "route for fluid to flow over a distance" while Dorel defines it as "a defined path for fluid having a distance that is longer than the path is wide, e.g., tubular."  (See Revised Ex. A).  For the reasons detailed herein, the Court gives this phrase its plain and ordinary meaning, and construes "elongate fluid path" to mean "a defined path for fluid having a distance that is longer than the path is wide."  The Court declines to adopt Dorel's proposal to add the example of the path being "tubular" as that is not found in the Patent and it adds an element that is not anchored to any specific claim or specification.

The patent history discloses that the '416 Patent was rejected due to prior art in which the air from a lower chamber would migrate into a second chamber through vents.  (See Dorel Ex. 6 at 134-36).  In response, Dr. Rajasingham added the word "elongated" to "fluid path" and specified that the first and second ends of the elongated fluid path were "spaced apart."  (Id. at 86, 89, 117).  Cozy's proposed definition, however, gives no meaning to the word "elongate," which was added to differentiate Dr. Rajasingham's invention from prior art.

Common definitions of "elongate" are "to extend the length of," "to grow in length," "stretched out" or "being much greater in length than in width."  *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/elongate (last visited Nov. 8, 2022).  (See also Dorel Resp. Br. at 9 and authorities cited).  Recognizing the

---

[9] The patent history indicates that the term should be "elongated" fluid path, not "elongate."  (See Dorel Ex. 6 at 86, 89, 117).

significance of the addition of "elongate" to distinguish the invention disclosed in the '416 Patent from the prior art, and absent any reason not to apply this plain and ordinary meaning, this Court will construe elongate fluid path to mean "a defined path for fluid having a distance that is longer than the path is wide."

### 7. "Enable Adjustment of Compression Characteristics During Impact"

The parties' next dispute concerns the phrase "enable adjustment of compression characteristics during impact," which is found in claims 1 and 12 of the '298 Patent, claims 1 and 13 of the '739 Patent, and claim 1 of the '835 Patent.  Dorel argues that this phrase is indefinite and precludes a person of ordinary skill in the art from understanding the scope of these claims.  Cozy argues that the phrase is sufficiently definite, and that to the extent a construction is needed it means "permit(ting) the (first) airbag to compress by the controlled release of air under impact."  (See Revised Ex. A).  As detailed herein, Dorel's argument mischaracterizes the language of the claim, and the court concludes that the phrase is not indefinite.

Claim 1 of the '298 Patent reads in relevant part as follows:

and wherein said supplementary porous filling material comprising a foam pad within, and plurality of vents comprising perforations in the flexible membrane *enable adjustment of compression characteristics during impact* of said first airbag to protect the occupant during inertial loading of the occupant under side impact conditions to the vehicle.

('298 Patent col. 24 ll. 35-41 (emphasis added); see also claim 12 (sim.)).

Claim 1 of the '739 Patent reads in relevant part as follows:

and wherein said supplementary porous filling material within and plurality of vents *enable adjustment of compression characteristics during impact of said first airbag* to protect the occupant under side impact conditions to the vehicle.

('739 Patent col. 21 ll.33-37 (emphasis added); <u>see</u> <u>also</u> claim 13 (sim.)).

Claim 1 of the '835 Patent reads in relevant part as follows:

An airbag prefilled with at least a predetermined volume of air with porous filling materials, and comprising vents for exhaust at a metered rate during impact, said porous filling materials and vents, *enabling adjustment of the compression characteristics of the airbag under impact,* thereby providing protection of an occupant in a vehicle under impact conditions.

('835 Patent col. 44 ll. 47-53 (emphasis added)).

Dorel does not contend that the phrase "compression characteristics" is indefinite. (<u>See</u> Dorel Resp. Br. at 13-14; <u>see</u> <u>also</u> Kent Decl. ¶ 67 ("The term 'compression characteristics' of a mechanical structure is a commonly used engineering term and would be well understood by a POSA.")). Rather, Dorel argues that "the requirement that the compression characteristics are adjusted 'during impact,'" renders it indefinite because "it is impossible to do[,]" since "compression characteristics" do not change "during impact." (Dorel Resp. Br. at 13-14). However, this Court agrees with Cozy that "[a] person of ordinary skill in the art would understand that the Asserted Patents 'enable adjustment of the compression characteristics during impact' by changing the compression characteristics in advance." (Cozy Resp. Br. at 17; <u>see</u> <u>also</u> Kent Decl. ¶¶ 71 ("A POSA would understand . . . that the degree and rate at which the claimed airbag would deform when an impact force is applied to it can be adjusted by changing the nature of the foam pad . . . and the number, location, shape, etc. of the vents in the membrane….")). Dr. Kent's opinion that the limitation means "that the compression characteristics can be modified and, as a result, [the airbags] will perform differently during impact" is supported by a fair reading of the claims at issue. (<u>See</u> Dorel Resp. Br. at 14 (summarizing Dr. Kent's deposition testimony)).

Throughout the claims, and as discussed in connection with various construction analyses above, "impact" is consistently linked to the evacuation of the contents of airbags. (See, e.g., '298 Patent col. 24 ll. 7-12 ("a first airbag configured to protect an occupant during side impact to the vehicle, prefilled with air supplemented with a porous filling material within, and having a plurality of vents configured to evacuate said air at a controlled rate upon impact during side impact to the vehicle.")).  The elements that are identified as affecting how the airbags react to impact have consistently been identified as the content of the airbags (*i.e.*, air and "porous filling material") and vents.  (See, e.g., id.).  Dr. Kent recognized that the compression characteristics of the airbags were controlled by the content of the bags and by the vents.  (Kent Decl. ¶¶ 71, 72).  Throughout the Patents, the content of the airbags and the existence of the vents are present, and thus adjustable, prior to the actual impact.  There is nothing in the challenged claims to indicate that Dr. Rajasingham meant anything different when he referenced the "compression characteristics of the airbag under impact."  See Innova/Paure Water v. Safari Water Filtration, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("Unless otherwise compelled, when different claims of a patent use the same language, we give that language the same effect in each claim"); Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC, 824 F.3d 999, 1004 (Fed. Cir. 2016) ("Ultimately, the only meaning that matters in claim construction is the meaning in the context of the patent" (internal quotations omitted)).

The Court declines, however, to adopt Cozy's proposal that the challenged language means "permit(ting) the (first) airbag to compress by the controlled release of air under impact."  This is an oversimplification of what is being claimed in the Patents, which include many other limitations as discussed above.  Therefore, the court will construe the claim as

meaning "enabling adjustment of the compression characteristics of the airbag so as to affect how it will respond under impact."

### 8. "Said Fluid Paths Conduct a Predetermined Controlled Volume of Said Compressible Fluid Out of Said Sacrificial Chamber to <u>Predetermined Locations Away from Said Sacrificial Chamber</u>"

The parties' next dispute focuses on the following italicized language from the "elongate fluid path" component of the Air Cushion System described in claim 1, paragraph c of the '416 Patent:

> c) at least one elongate fluid path, each with first and second spaced apart end, and each comprising flow control mechanisms, that is connected to said sacrificial chamber at its first end, and filled with said compressible fluid, such that under impact to the sacrificial chamber, *said fluid paths conduct a predetermined controlled volume of said compressible fluid out of said sacrificial chamber to predetermined locations away from said sacrificial chamber* ....

('416 Patent col. 21 ll. 22-30 (emphasis added)).  Cozy maintains that this phrase requires no construction and should therefore be given its plain and ordinary meaning.  (Cozy Opening Br. at 14).  While Dorel agrees that the phrase would ordinarily be clear, it argues that construction of the claim language is necessary due to the parties' inability to agree on its plain and ordinary meaning.  (Dorel Opening Br. at 20).  According to Dorel, Cozy intends to argue that "*some volume of air*" will satisfy this claim limitation in its entirety, but that the phrase should be construed to mean that "the fluid paths conduct a *known* volume of fluid out of the sacrificial chamber to predetermined locations, *independent of location or force of impact*."  (Dorel Opening Br. at 19-20 (emphasis added)).  This court agrees that it is necessary to resolve the parties' dispute despite Cozy's assertion that no construction is required.  See <u>O2 Micro Int'l</u>, 521 F.3d at 1362.  For the reasons that follow, this court finds that the phrase at issue should be construed in accordance with its plain and ordinary meaning to mean that the "fluid paths

conduct a predetermined regulated volume of compressible fluid contained in the sacrificial

chamber out of the sacrificial chamber to known locations away from the sacrificial chamber."

Cozy argues that Dorel's proposed construction is improper because it "requires the

same amount of air to be released from the sacrificial chamber regardless of the location or

force of the impact." (Cozy Opening Br. at 14). According to Cozy,

> [t]his is directly contrary to the intrinsic record. The release of air out of the
> sacrificial chamber occurs because it is compressed upon impact. As every impact
> is different, so must be the release of air. As a result, the degree to which the
> sacrificial chamber is compressed *cannot* be independent of the location or force
> of impact.

(Id. (emphasis in original; internal citations omitted)). Dorel disputes Cozy's assertion that its

proposed construction is inconsistent with the intrinsic record or that the volume of air

released from the sacrificial chamber is dependent upon the location and force of impact.

(Dorel Resp. Br. at 8). According to Dorel, Dr. Rajasingham "told the world that the fluid paths

would 'conduct a predetermined controlled volume' of air to 'predetermined locations away

from (the) sacrificial chamber.'" (Id.). It further contends that by "arguing that such

parameters cannot be known after all, Cozy is simply casting doubt on the viability of the patent

claims" and disavowing the plain and ordinary meaning of the claim language. (Id.).

This court agrees with Cozy's assertion that Dorel's proposed use of the phrase

"independent of location or force of impact" is undermined by the intrinsic record, which links

the release of fluid out of the sacrificial chamber to its compression upon impact. Claim 1 of

the '416 Patent specifically discloses an "Air Cushion System" comprising "at least one sacrificial

chamber located in a predetermined position within said impacted structure, such that *said*

*impact from impacting object, will compress said sacrificial chamber,* said sacrificial chamber

[41]

being filled with a compressible fluid at the time of said impact[.]"  ('416 Patent col. 21 ll. 16-21

(emphasis added)).  It also discloses the release of compressible fluid out of the sacrificial

chamber "*under impact to the sacrificial chamber*[.]" (Id. col. 21 ll. 26-29 (emphasis added)).

The specification similarly describes

> a Passive Air Cushion System that *uses the pressure in one or more sacrificial*
> *chambers which under pressure transfer air* to one or more micro-air cushions that
> protect high priority anatomical regions.  In this [embodiment], the passive
> anatomical micro air cushion (131), derives it[s] inflation source from the
> *sacrificial chamber (139) ... that is compressed by a much greater body mass under*
> *impact*.

(Id. col. 16 ll. 36-43 (emphasis added).  Therefore, the intrinsic evidence demonstrates that the

release of "a predetermined controlled volume of said compressible fluid out of said sacrificial

chamber" depends, at least in part, upon the nature and force of impact.[10]

    When viewed in this context, it is apparent that Dr. Rajasingham's use of the phrase

"predetermined controlled volume of said compressible fluid" in claim 1 of the '416 Patent is

intended to summarize aspects of the invention that have already been disclosed in earlier

paragraphs of the claim.  Thus, the only reasonable interpretation of Dr. Rajasingham's

selection of the term "predetermined" is to describe the contents of the sacrificial chamber,

which is conducted out of the sacrificial chamber at the time of impact.  The term "controlled,"

as this court has determined previously, refers to the regulation of fluid out of the sacrificial

---

[10] This court's conclusion that the volume of compressible fluid released from the sacrificial chamber
must be linked to the nature and force of impact is further supported by the opinion of Cozy's expert,
Dr. Kent.  According to Dr. Kent, a person of ordinary skill in the art of the invention would understand
that "[t]he mechanism by which the fluid is conducted by the fluid paths is compression of the sacrificial
chamber during impact.  The degree to which the sacrificial chamber is deformed cannot be
independent of the force of impact."  (Kent Decl. ¶ 60).

chamber by the flow control mechanisms described in claim 1, and therefore means

"regulated." Accordingly, this court concludes that the first segment of the phrase at issue

should be construed to mean that the "fluid paths conduct a predetermined regulated volume

of compressible fluid contained in the sacrificial chamber out of said sacrificial chamber."

The second segment of the phrase at issue reads: "to predetermined locations away

from said sacrificial chamber." ('416 Patent col. 21 ll. 29-30). There appears to be no dispute

that the plain and ordinary meaning of this language should apply. Nor does there appear to be

any dispute about that meaning. Therefore, this court finds that no further construction is

necessary. The disputed phrase shall be construed to mean that the "fluid paths conduct a

predetermined regulated volume of compressible fluid contained in the sacrificial chamber out

of the sacrificial chamber to known locations away from the sacrificial chamber."

### 9. "An Impacted Structure"

The parties have agreed to a construction.

### 10. "Enabled to Cushion an Occupant Ahead of Impact to the Vehicle"

The next claim language in dispute consists of the following italicized phrase, which is

included in claim 1 of the '298 Patent:

> wherein said first airbag pre-filled with air and with said porous filling material
> comprising a foam pad within is *enabled to cushion an occupant ahead of impact*
> *to the vehicle*, by releasing air through said perforations in said flexible membrane
> during transient inertial loading of the airbag by the occupant, and absorbing air
> through perforations upon expansion of said foam pad[.]

('298 Patent col. 24 ll. 23-29 (emphasis added)). Cozy maintains that this phrase requires no

construction and that its plain and ordinary meaning should apply. (Revised Exhibit A).

According to Cozy's interpretation, the plain and ordinary meaning of the phrase "describes

[43]

cushioning an occupant's head before impact with the vehicle, *i.e.*, before the person's head impacts with the hard frame of the vehicle, it will be cushioned." (Cozy Opening Br. at 15). Dorel, on the other hand, argues that the Asserted Patents, including the specification of the '298 Patent, disclose a system that "anticipates impact and deploys the airbag(s) ahead of time to protect the occupant." (Dorel Opening Br. at 22). Accordingly, Dorel contends that the relevant language should be construed to mean "enabled to anticipate impact to the vehicle and cushion the occupant in advance." (Revised Exhibit A). For the reasons that follow, this court finds that both parties are attempting to introduce concepts that are inconsistent with the plain and ordinary meaning of the claim language, which is clear and needs no construction or analysis beyond an explanation as to why the parties' interpretations are improper.

Dorel's proposed construction, in which the airbag is enabled "to anticipate impact to the vehicle," is unsupported by claim 1 of the '298 Patent. Nothing in that claim discloses the use of sensors or other mechanisms that could anticipate an impact to the vehicle. (See '298 Patent col. 24 ll. 6-41). Nor does the specific phrase at issue contain any words to support such an interpretation. When given its plain and ordinary meaning, the phrase "enabled to cushion an occupant ahead of impact" means that the airbag of claim 1 is given the ability or means "to cushion" an occupant before the occurrence of any impact to the vehicle. See *Merriam-Webster.com Dictionary,* Merriam-Webster, https://www.merriam-webster.com/dictionary/enable (defining "enable" to mean, *inter alia,* "to provide with the means or opportunity" and "to make possible, practical, or easy") (last visited Nov. 8, 2022). This reading is supported by the remaining words of the paragraph, which demonstrate that the airbag is able to cushion the occupant "by releasing air through [the] perforations in [the

[44]

airbag's] flexible membrane during transient inertial loading of the airbag by the occupant, and absorbing air through perforations upon expansion of [the] foam pad[.]"  ('298 Patent col. 24 ll. 23-29).

As Dorel explains in its papers, its proposed construction is based on drawings and embodiments set forth in the '298 Patent's specification.  (See Dorel Opening Br. at 22).  For example, Dorel relies on the specification's description of embodiments having "external airbags *proactively deployed* in the manner described herein, *prior to impact* and their performance as Micro Air Cushion systems."  (Id. (quoting '298 Patent col. 21 l. 66 – col. 22 l. 2) (emphasis added)).  It also relies on the specification's description of a system in which distance and velocity sensors are used to deploy airbags upon detection of an approaching vehicle.  (See id.; see also '298 Patent Fig. 2-3 & col. 10 ll. 4-11).  As this court has ruled previously, however, "[l]imitations from the specification ... cannot be imported into the claims[.]"  3M Innovative Props. Co., 350 F.3d at 1372.  Therefore, Dorel's reliance on embodiments from the specification is insufficient to support a construction in which the airbag of claim 1 is "enabled to anticipate impact to the vehicle."  See Phillips, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

Cozy's interpretation of the plain and ordinary meaning of the phrase at issue is also inconsistent with the disclosures of claim 1.  In particular, Cozy's characterization of the claim as describing the "cushioning [of] an occupant's head" before the occupant's "head impacts with the hard frame of the vehicle" is not supported by any words of the disputed phrase or by any other language contained in the claim.  (See Cozy Opening Br. at 15).  While the claim

describes an airbag enabled to cushion an "occupant," the word "head" is not included in any portion of the claim.  (See '298 Patent col. 24 ll. 6-41).  Nor is there any other language to suggest that the airbag of claim 1 must be located in the vicinity of the occupant's head.  (See id.).  In contrast, the dependent claims of the '298 Patent expressly call for airbags "to be located proximate [to] an occupant's head or neck."  (See id. col. 24 ll. 42-48).  This provides further support for the conclusion that independent claim 1 contains no such limitation.  See Phillips, 415 F.3d at 1314-15 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Cozy's assertion that the "impact" disclosed in claim 1 relates to the impact of an occupant's head against the frame of the vehicle is also unsupported by any of the intrinsic evidence.  Claim 1 of the '298 Patent describes the function of the airbag as protecting the occupant from an external "impact to the vehicle."   (See '298 Patent col. 24 ll. 7-8 (reciting "a first airbag configured to protect an occupant during side impact to the vehicle"); ll. 23-26 (disclosing the first airbag as "enabled to cushion an occupant ahead of impact to the vehicle"); ll. 35-41 (describing "adjustment to compression characteristics" to protect the occupant "under side impact conditions to the vehicle.")).  It contains no wording to suggest that the "impact" referred to in claim 1 relates to the impact of an occupant's head, or any other portion of an occupant, against the frame of the vehicle.  Furthermore, the specification includes multiple drawings depicting an "impacting body" or "impacting object" advancing toward the passenger vehicle in which the invention is located.  (See '298 Patent Fig. 1-3 & col. 9 l. 65 – col. 10 l. 11).  Accordingly, Cozy's interpretation, like Dorel's proposed claim

construction, fails to adhere to the plain and ordinary meaning of the phrase "enabled to cushion an occupant ahead of impact to the vehicle."

### 11. **"An Occupant" and "Passenger"**

The parties have agreed to a construction.

### 12. **"Protected Entity"**

The parties have agreed to a construction.

### 13. **"Predetermined Time"**

The penultimate issue raised by the parties with respect to claim construction concerns the words "predetermined time," as used in claim 10 of the '416 Patent, which reads in its entirety as follows:

> An air cushion system as in claim 1, wherein at least one of said sacrificial chamber and micro air-cushions are vented to ensure that the micro aircushions support the protected entity for a *predetermined time* before deflating to provide protection to the protected entity immediately after said impact.

('416 Patent col. 22 ll. 50-55 (emphasis added)). Cozy's proposed construction would define these words to mean a "measurable duration" or, in the alternative, a "designable duration." (Cozy <u>Markman</u> Presentation at 64). Dorel proposes a construction in which the words are defined to mean "a known period of time irrespective of impact." (Dorel Opening Br. at 23). This court finds that both parties' proposals include concepts that are inconsistent with the intrinsic evidence and that the words "predetermined time," as used in claim 10, should be construed to mean a "period of time that has been determined beforehand."

It is undisputed that the invention recited in claim 10 of the '416 Patent relies on the use of vents to control the release of fluid from the micro-air cushions and provide support for the protected entity for a predetermined time after impact. (<u>See</u> Dorel Opening Br. at 23; Cozy

Resp. Br. at 14).  The parties' dispute focuses on what is meant by a "predetermined" time.

Dorel argues that during prosecution of the '416 Patent, Dr. Rajasingham distinguished his

invention from the prior art by arguing that in his system, "control mechanisms determine the

timing and duration of inflation."  (Dorel Opening Br. 23 (internal quotations omitted)).

According to Dorel, its proposed definition, "a known period of time irrespective of impact," is

consistent with this prosecution history and also incorporates "the ordinary meaning of

'predetermined' to mean 'known.'"  (Id.).  Cozy counters that because the release and

regulation of air flow through the system is linked to the impact caused by a collision, "the

exact duration of airbag deflation is directly related to the force of the impact of the protected

entity, [and] while it can be designed, it cannot be designed 'irrespective of impact.'"  (Cozy

Resp. Br. at 15).  It also argues that "[t]he inventor left the requirement of the predetermined

time open-ended based on the velocity of the impact, rather than providing a specific time."

(Cozy Opening Br. at 17).

      For the reasons detailed above, Dorel's proposed use of the words "irrespective of

impact" is inconsistent with the intrinsic record, which demonstrates that the Air Cushion

System disclosed in the '416 Patent functions differently under different impact conditions.

While control mechanisms and vents may be used to regulate the volume and rate of fluid

flowing into and out of the micro-air cushions, the Patent teaches that the flow is also

determined, at least in part, by the nature and force of impact.  Therefore, the "predetermined

time" during which the micro-air cushions remain inflated cannot be decoupled from impact.

      The prosecution history relied on by Dorel does not support a different conclusion.

While Dr. Rajasingham did mention "control mechanisms [that] determine the timing and

duration of inflation" when distinguishing his invention from the prior art, Dorel's

characterization of his argument is inaccurate.  (See Dorel Opening Br. at 23).  Specifically, the

record establishes that during prosecution of the '416 Patent, Dr. Rajasingham distinguished his

invention from the background art of Sinnhuber as follows:

> Sinnhuber (6,158767) discloses multiple airbags that are independently inflated
> with inflators, but physically connected together to provide a continuous curtain
> while maintaining separate chambers.  *Control mechanisms determine the timing
> and duration of inflation depending on conditions.*  Nothing in Sinnhuber discloses
> a sacrificial chamber that upon impact provides an inflation means for secondary
> aircushions or any of the related embodiments of the present invention.
> Moreover, Sinnhuber has a later priority date than the first priority date of the
> present invention.

(Dorel Ex. 6 at 165 (emphasis added)).  Accordingly, Dr. Rajasingham was describing Sinnhuber's

invention, not the '416 Patent, when he was referring to the control mechanisms that

determine timing and duration of inflation.  He also noted that the timing and duration of

inflation depended on "conditions."  If anything, Dr. Rajasingham's argument that his system

"discloses a sacrificial chamber that *upon impact* provides an inflation means for secondary

aircushions" confirms the significance of impact to the operation of the invention.  (See id.

(emphasis added)).

This court does agree with Dorel to the extent it suggests that the use of the term

"predetermined" in the context of claim 10 refers to a specific, pre-selected period of time.  In

this particular instance, this construction is supported by the specification, which provides in

relevant part as follows:

> Yet another embodiment utilizes the independence of the venting of micro
> aircushions and the venting of the sacrificial chamber, to maintain the inflation of
> the air cushions well after the time frame for impact absorbtion *(sic)* by the
> sacrificial chamber such that the passenger is held in a *safe position for a
> predetermined time.  Some such embodiments may hold the passenger for a period*

[49]

> *of up to say 3 seconds to protect the passenger in the event of a roll over of the vehicle*.

('416 Patent col. 19 l. 66 – col. 20 l. 7 (emphasis added)).  Thus, unlike the use of "predetermined" in claim 1 to describe the contents of the sacrificial chamber, the embodiment relevant to claim 10 illustrates that the term "predetermined" in claim 10 is used to describe a specific period of time.  It also supports a construction that is based on the ordinary meaning of "predetermined," which is "to determine beforehand."  *Merriam-Webster.com Dictionary,* Merriam-Webster, https://www.merriam-webster.com/dictionary/predetermine (last visited Nov. 8, 2022).  In sum, the Patent teaches the use of vents to maintain the inflation of the micro-air cushions for a specific period of time that has been "determined beforehand."

Cozy's proposed use of the words "measurable" or "designable" ignores the term "predetermined."  It is also inconsistent with the embodiment described in the specification, which demonstrates an intent to select a specific period of time.  Moreover, the concepts introduced by Cozy's proposed terms are not encompassed by the language used in claim 10 or incorporated into the Air Cushion System described in claim 1.  Therefore, this court finds that Cozy's proposal is inappropriate and that the proper construction of "predetermined time" is a "period of time that has been determined beforehand."

### 14. <u>"An Anatomically Appropriate (Shape)"</u>

The final claim term in dispute consists of the phrase "an anatomically appropriate" (shape), as used in claim 10 of the '298 Patent and claim 11 of the '739 Patent as follows:

> The child seat of claim 1, wherein the first airbag is one or both of: configured in an *anatomically appropriate* shape; and has an adjustable vertical position.

('298 Patent col. 25 ll. 8-10 (emphasis added); '739 Patent col. 21 ll. 65-67 (emphasis added)).

Cozy argues that the phrase should be defined to mean a "shape appropriate to cushion a

child's head or neck." (Cozy Opening Br. at 17). According to Cozy, its proposed construction is

supported by "[t]he asserted claims[, which] recite a shape 'appropriate' for a specific purpose,

*i.e.*, to cushion the head or neck." (Id.). However, Dorel disagrees and contends that Cozy's

proposed construction "is untethered from anything in the Asserted Patents[.]" (Dorel Resp. Br.

at 12). According to Dorel, the phrase "an anatomically appropriate" (shape) should be defined

to mean "specifically configured to fit to an anatomical portion." (Dorel Opening Br. at 23). It

further maintains that this "is the only definition supported by the intrinsic record[,]" including

the Patents' specification, as well as statements that Dr. Rajasingham made during prosecution

of U.S. Patent No. 9,150,127 (the "127 Patent"), which Cozy claims is in the priority chain of the

Asserted Patents. (Dorel Opening Br. at 23-24; Dorel Resp. Br. at 12-13). For the reasons

described below, this court finds that the phrase "an anatomically appropriate" (shape), as used

in claim 10 of the '298 Patent and claim 11 of the '739 Patent, should be construed to mean "a

shape that conforms to a portion of a child's body." That portion may include, but is not limited

to, a child's head or neck.

This court finds, as an initial matter, that there is insufficient support for Cozy's proposal

to include the words "to cushion a child's head or neck" in the construction of the disputed

phrase. In its plain and ordinary sense, the word "anatomically" means "related to the human

body and how its parts are arranged." *Cambridge English Online Dictionary*, Cambridge

University Press, https://dictionary.cambridge.org/us/dictionary/english/anatomically (last

visited Nov.8, 2022). While the Patents claim a "child seat," there are no specific references to

a child's "head" or "neck" in claim 10 of the '298 Patent or claim 11 of the '739 Patent.  Nor are

there any such references in the independent claims on which claims 10 and 11 depend.  (<u>See</u>

'298 Patent col. 24 ll. 6-41; '739 Patent col. 21 ll. 18-37).   Additionally, both of the Patents

include separate claims in which one or more airbags are specifically located, designed or

configured to protect the occupant's "head" and/or "neck."  (<u>See</u>, <u>e.g.</u>, '298 Patent col. 24 ll. 46-

54, col. 24 l. 65 – col. 25 l. 7; '739 Patent col. 21 ll. 44-50, 63-64, col. 22 ll. 44-67).   Ordinarily,

separate "claims of a patent are presumptively of different scope."  <u>See</u> <u>Kraft Foods, Inc. v. Int'l</u>

<u>Trading Co.</u>, 203 F.3d 1362, 1366 (Fed. Cir. 2000).  Therefore, Dr. Rajasingham's inclusion of a

"head" and/or "neck" limitation in a number of separate claims supports the conclusion that no

such limitations should be read into the claims at issue.

       This court similarly finds that there is no basis for adopting Dorel's requirement that the

airbag be configured to "fit" to an anatomical portion such as a head or neck.  While the claim

language calls for the first airbag to be "configured" in an anatomically "appropriate shape," it

does not require a "fit."  (<u>See</u> '298 Patent col. 25 ll. 8-10; '739 Patent col. 21 ll. 65-67).  Nor do

the sections of the specification on which Dorel relies require the airbag disclosed in the claims

to "fit" an anatomical portion of the occupant.  Figure 12J2, on which Dorel relies, depicts

"Safety Harness Head and neck anatomical *micro aircushions* (active or passive)" in which the

"micro-air cushions" are deployed to conform to the shape of the occupant's neck.  (<u>See</u> '298

Patent Fig. 12J2 & col. 12 ll. 12-14 (emphasis added); '739 Patent Fig. 12J2 & col. 8 ll. 23-27

(emphasis added)).  However, it does not purport to focus on the "first airbag" of claim 1 or on

the dependent claims at issue here.[11]  Similarly, Dorel's reliance on a description of an embodiment in which the "Passive Air Cushion System" uses "pressure in one or more sacrificial chambers" to "transfer air to one or more *micro-air cushions* that protect high priority anatomical regions" provides no insight into the configuration of the "first airbag" referenced in claim 1 of the Patents and the dependent claims in dispute.  (See '298 Patent col. 19 ll. 15-19 (emphasis added); '739 Patent col. 16 ll. 16-20 (emphasis added)).  Accordingly, the cited portions of the specification provide no support for Dorel's proposed use of the term "fit" in the construction of the disputed claims.

On the other hand, Dr. Rajasingham's comments during prosecution of the '127 Patent provide guidance regarding the inventor's use of the term "anatomical" and what he meant by the words "anatomically appropriate shape."  The record shows that in the course of prosecuting the '127 Patent, Dr. Rajasingham distinguished his invention from the invention of Kruse.  (Dorel Ex. 10 at 3).  Specifically, after describing the disclosures of Kruse, Dr. Rajasingham stated in relevant part as follows:

> This contrasts with the present invention as amended, where a single anatomical cushion is enabled to take the shape of the back of the head or the thorax by <u>venting</u> to a secondary chamber.  This is an important distinction: *Venting implies removal of viscous fluid in the primary anatomical chamber until such time as the shape of the anatomical cushion conforms to either the back of the head or the thorax.*  Moreover[,] the construction of the upholstery in Kruse will not permit the architecture of the present invention of a single anatomical cushion *conforming* to the back of the head or the thorax.  *The present invention as amended, has a primary anatomical chamber that is in contact with the occupant, and a secondary chamber to which it vents to remove surplus fluid to enable the anatomical cushion to conform to the shape of an anatomical element.*  In this

---

[11] As described above, it is undisputed that the "airbag" described in claim 1 of the '298 and '739 Patents is distinct from the "air cushion" described in claim 6 of the '298 Patent and claim 7 of the '739 Patent.

context the applicant welcomes the examiner's diligence in ensuring Section 101 – human organism requirement is not violated.  *The applicant has not claimed any aspect of a human organism but rather a "shape conforming to" parts of a human organism.*

(Id. at 3-4 (italicized emphasis added)).

As in the case of the '127 Patent, claim 1 of the '298 Patent and claim 1 of the '739 Patent disclose a "first airbag" that is in contact with the occupant, is vented and is "configured to evacuate" air upon impact.  (See '298 Patent col. 24 ll. 6-29; '739 Patent col. 21 ll. 18-27).  The dependent claims at issue also disclose a "first airbag" that may be "configured in an anatomically appropriate shape."  ('298 Patent col. 25 ll. 8-10; '739 Patent col. 21 ll. 65-67).  As Dr. Rajasingham described when discussing the '127 Patent, his reference to an anatomical shape means "a shape conforming to" parts of a human occupant.  Because claim 10 of the '298 Patent and claim 11 of the '739 Patent pertain to a child seat, this court concludes that "an anatomically appropriate" (shape), as used in those claims, should be construed as "a shape that conforms to a portion of a child's body."

### 15. **"A Plurality of Vents"**

The parties have agreed to a construction.

### IV. **ORDER**

For all the reasons detailed herein, it is hereby ORDERED that the disputed claim terms have the meanings described above and set forth in Attachment A hereto.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

[54]