UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| COZY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 21-10134-JGD |
| | ) | |
| DOREL JUVENILE GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON DOREL'S
## MOTION TO COMPEL DISCLOSURE OF DOCUMENTS PURSUANT
## <u>TO THE CRIME-FRAUD EXCEPTION TO THE ATTORNEY-CLIENT PRIVILEGE</u>

July 27, 2023

DEIN, U.S.M.J.

### I. <u>INTRODUCTION</u>

The plaintiff, Cozy, Inc. ("Cozy"), is a company that is owned by Dr. Arjuna Rajasingham.

It has brought this action against the defendant, Dorel Juvenile Group, Inc. ("Dorel"), claiming

that Dorel's AirProtect® technology infringes on four of its patents, including U.S. Patent Nos.

9,902,298 (the "'298 Patent"), 9,669,739 (the "'739 Patent"), 7,156,416 (the "'416 Patent") and

8,136,835 (the "'835 Patent") (collectively, the "Asserted Patents").  Dorel denies infringement

and contends that the Asserted Patents are invalid and otherwise unenforceable.  It has also

asserted counterclaims for inequitable conduct by which it alleges that Cozy made material

misrepresentations and omissions in connection with its prosecution of the Patents before the

United States Patent and Trademark Office ("PTO").

The matter is before the court on Dorel's motion to compel the production of documents listed on the plaintiff's privilege log on the grounds that the documents are subject to the crime-fraud exception to the attorney-client privilege (Docket Nos. 201, 325).  Dorel argues that there is sufficient evidence before the court "to make out a *prima facie* showing that, using information he received from counsel, Dr. Rajasingham -- through a complex set of false priority claims and corrections -- engaged in an elaborate scheme to both ensnare Dorel's AirProtect® technology and artificially extend the life of the Asserted Patents."  (Docket No. 325 at 2).  In other words, Dorel claims that Dr. Rajasingham, and by extension Cozy, relied on the advice of counsel to facilitate a fraud on the PTO.  Accordingly, by its motion, Dorel is seeking an order compelling Cozy to produce "all communications between Dr. Rajasingham and counsel from 2013 through 2017 concerning activity or potential activity (e.g., prosecution activity, post-grant activity, post-grant proceedings) before the PTO related to the Asserted Patents."  (Id. at 15).  After consideration of the parties' written submissions and oral arguments, as well as an *in camera* review of the documents that Cozy submitted pursuant to this court's Supplemental Order on Dorel's Motion to Compel (Docket No. 292) ("Supplemental Order"), Dorel's motion to compel is ALLOWED IN PART and DENIED IN PART.  Specifically, the motion is allowed with respect to the documents listed in Exhibit A attached hereto but denied with respect to the remaining documents.

## II. <u>BACKGROUND</u>

Dorel originally challenged Cozy's claims of attorney-client privilege on January 13, 2023.  At that time, Dorel filed a motion to compel in which it argued, *inter alia*, that Cozy's privilege claims were unreliable because its descriptions of various documents listed on its

privilege log were contradicted by prior testimony, affidavits and discovery responses from the plaintiff and its witnesses. (Docket No. 202 at 13).[1]  By its motion, Dorel requested an order compelling the production of those documents or, in the alternative, an *in camera* review of certain categories of documents from Cozy's privilege log in order to assess the accuracy of Cozy's descriptions and to determine the veracity of Cozy's assertions regarding the role of its counsel and when it first contemplated litigation.  Additionally, Dorel requested an evaluation of the disputed documents to determine whether the crime-fraud exception to the attorney-client privilege might apply.  (See id. at 16-20).  On March 8, 2023, this court issued its Supplemental Order allowing in part and denying in part Dorel's motion to compel.  As detailed in that Order, this court concluded that Dorel had met its burden of proving that an *in camera* review was appropriate with respect to the following categories of documents: (1) legal advice regarding patent claims; (2) legal advice regarding patent infringement litigation prior to 2018; and (3) communications with former Cozy board member and counsel, Travis Brown. (Supplemental Order at 8-11).  As to the scope of the review, this court agreed to evaluate whether Cozy's descriptions of the documents on its privilege log were appropriate and whether those documents might fall within the scope of the crime-fraud exception.  (See id. at 8-11).  However, this court declined to review the documents to determine when Cozy first contemplated litigation against Dorel.  (Id. at 9).  It also declined to review the privileged documents to determine whether they contain business information rather than legal advice.

---

[1] Unless otherwise indicated, citations to page numbers refer to the page of the cited document rather than the court's CM/ECF number across the top of the page.

(Id. at 10).  Cozy has since submitted the documents identified in the Supplemental Order and this court has completed its *in camera* review.

After Cozy submitted the disputed documents to the court for an *in camera* review, Dorel requested leave to complete supplemental briefing relating to its argument for application of the crime-fraud exception.  (Docket No. 318 at 2-3).  The request was allowed and both parties have filed supplemental briefs on this issue.  (See Docket Nos. 325, 341, 352). This court also heard oral argument on this matter during a hearing held on June 16, 2023. However, Cozy did not submit a request for an *ex parte* hearing or indicate that any such hearing was necessary.  In light of Cozy's decision not to request such a hearing, and this court's responsibility to decide Dorel's counterclaims for inequitable conduct,[2] which raise some of the same issues as the instant motion for application of the crime-fraud exception, this court finds that an *ex parte* hearing is unwarranted at this stage in the proceedings.  Accordingly, the question whether the crime-fraud exception to the attorney-client privilege applies to Cozy's documents, such that they should be produced to Dorel in discovery, is ripe for adjudication. As described below, this court finds that certain of these documents fall within the crime-fraud exception to the attorney-client privilege and must be produced.[3]

---

[2] A claim for "[i]nequitable conduct is equitable in nature, with no right to a jury, and the trial court has the obligation to resolve the underlying facts of materiality and intent." Am. Calcar, Inc. v. Am. Honda Motor Co., Inc., 651 F.3d 1318, 1333 (Fed. Cir. 2011).

[3] This court concludes that it is not necessary to evaluate whether Cozy's descriptions of the documents on its privilege log are accurate.  To the extent this court has not ordered the production of the documents pursuant to the crime-fraud exception, it has reviewed them and confirmed that they have been properly withheld from production under the attorney-client privilege.

## III. <u>CRIME-FRAUD EXCEPTION STANDARD OF REVIEW</u>

The attorney-client privilege, as a general matter, "protects at the client's behest confidential communications between lawyer and client made to facilitate legal services for the client." <u>United States v. Rakes</u>, 136 F.3d 1, 3 (1st Cir. 1998). "Although the underlying rationale for the privilege has changed over time, courts long have viewed its central concern as one 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" <u>United States v. Zolin</u>, 491 U.S 554, 562, 109 S. Ct. 2619, 2625-26, 105 L. Ed. 2d 469 (1989) (quoting <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981)) (additional citation and footnote omitted). However, that concern "ceas[es] to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing." <u>Id.</u> at 562-63, 109 S. Ct. at 2626 (alteration in original) (emphasis and internal citations omitted). "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." <u>Id.</u> at 563, 109 S. Ct. at 2626 (internal quotations and citations omitted). Therefore, under the crime-fraud exception, "the attorney-client privilege is forfeited *inter alia* where the client sought the services of the lawyer to enable or aid the client to commit what the client knew or reasonably should have known to be a crime or fraud." <u>Rakes</u>, 136 F.3d at 4. By its motion to compel, Dorel contends that Dr. Rajasingham, and hence Cozy, relied on the advice of its counsel to engage in fraud on the PTO.

In patent cases such as the instant litigation, Federal Circuit law governs the application of the crime-fraud exception to the attorney-client privilege.  Unigene Labs, Inc. v. Apotex, Inc., 655 F.3d 1352, 1358 (Fed. Cir. 2011).  To invoke the crime-fraud exception under the law of that Circuit, the party challenging the attorney-client privilege must make a *prima facie* showing that the client "committed or intended to commit a fraud or crime and that the attorney-client communications in question were in furtherance of that crime or fraud."  Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1329 (Fed. Cir. 2011).  Therefore, to prevail on its motion to compel in the instant case, Dorel must make a *prima facie* showing that Dr. Rajasingham committed or intended to commit a fraud on the PTO and that the attorney-client communications in question were in furtherance of that fraud.  In evaluating whether this standard has been met, the court is mindful that it is the "client's intentions" that control, and that the crime-fraud exception may apply even if the attorney is completely innocent, totally ignorant of the client's purpose and/or an "unwitting tool" in the client's wrongful conduct.  In re Grand Jury Proceedings (Gregory P. Violette), 183 F.3d 71, 79 (1st Cir. 1999) (collecting cases).  Accordingly, the relevant issue is not whether Cozy's attorneys were involved in the alleged wrongdoing, "but rather whether [Dr. Rajasingham] intended to use the attorney[s'] advice to perpetuate" a fraud on the PTO.  United States v. Joyce, 311 F. Supp. 3d 398, 407 (D. Mass. 2018) (internal quotations omitted).

The Federal Circuit has emphasized that the *prima facie* showing needed to support the application of the crime-fraud exception does not involve "'a particularly heavy' burden[.]"  Micron Tech., 645 F.3d at 1330 (quoting In re Grand Jury Investigation, 445 F.3d 266, 274 (3d Cir. 2006)).  It merely "requires presentation of 'evidence which, if believed by the fact-finder,

would be sufficient to support a finding that the elements of the crime-fraud exception were met.'"  In re Grand Jury Subpoena, 223 F.3d 213, 217 (3d Cir. 2000) (quoting Haines v. Liggett Grp. Inc., 975 F.2d 81, 95-96 (3d Cir. 1992)).  For the reasons detailed below, this court finds that the undisputed evidence presented in this case, as well as the documents reviewed by this court *in camera*, warrant application of the crime-fraud exception with respect to a number of the challenged documents.

## IV. ANALYSIS

### A.  Prima Facie Showing of Fraud

The first issue raised by Dorel's motion to compel is whether Dorel has presented sufficient evidence to show that Cozy committed or intended to commit a fraud on the PTO. Dorel argues that it has made the requisite showing based on evidence of "Dr. Rajasingham's inconsistent priority claims before the [PTO]; the Asserted Patents' 'chaotic' prosecution histories; the descriptions on Cozy's privilege log that belie Dr. Rajasingham's and Cozy's prior representations that Dr. Rajasingham prosecuted the Asserted Patents without communicating or consulting with counsel; and communications between Dr. Rajasingham and counsel the Court has reviewed, *in camera*, and that the Court, itself, has noted 'may be relevant to the crime fraud exception.'"  (Docket No. 325 at 1-2 (citation and footnote omitted)).  Dorel also relies on Dr. Rajasingham's deposition testimony as evidence that "he knowingly made false priority claims to the PTO to extend the life of his patents and/or to be granted patent rights to which he was never entitled."  (Id. at 7).  This court finds that evidence relating to Dr. Rajasingham's representations to the PTO regarding his priority claims for the Asserted Patents, if believed by a factfinder, is sufficient to support a finding that Dr. Rajasingham engaged in a

scheme to manipulate the scope of his patents and perpetuate a fraud on the PTO during the time period coinciding with the attorney-client communications at issue.

### Elements of Fraud

Federal Circuit law provides that a party wishing to pierce the attorney-client privilege based on the crime-fraud exception "must establish *Walker Process* fraud, also known as common law fraud[.]" Unigene Labs, 655 F.3d at 1358 (citing Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177, 86 S. Ct. 347, 350, 15 L. Ed. 2d 247 (1965)). This requires a higher burden of proof than needed to establish inequitable conduct.[4] See In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 807 (Fed. Cir. 2000) (explaining that "[i]nequitable conduct in fact is a lesser offense than common law fraud, and includes types of conduct less serious than knowing and willful fraud." (internal quotations and citation omitted)). Thus, to establish a *prima facie* case of common law fraud, the accusing party must present evidence sufficient to satisfy the following elements:

> (1) a representation of material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation[.]

Unigene Labs, 655 F.3d at 1359 (quoting Spalding Sports, 203 F.3d at 807).

---

[4] In its written filings with the court, Dorel suggested that a *prima facie* showing of inequitable conduct would suffice to support the application of the crime-fraud exception. (See Docket No. 352 at 4-5). However, during oral argument on its motion to compel, Dorel agreed with Cozy's assertion that under Federal Circuit law, application of the crime-fraud exception requires a *prima facie* showing of common law or *Walker Process* fraud. (See Docket No. 361 at 16).

As the Federal Circuit has explained further, the accusing party may rely on evidence of "misrepresentations *or omissions*" to establish a *prima facie* claim of fraud on the PTO.  See Spalding Sports, 203 F.3d at 807 (emphasis added).  Additionally, "the party seeking to overcome the attorney-client privilege need not conclusively prove fraud, or necessarily submit direct evidence to make a *prima facie* showing of fraud[.]"  Id. at 808.  On the other hand, a finding of common law or *Walker Process* fraud "must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, *i.e.*, that the patent would not have issued but for the misrepresentation or omission."  Id. at 807.  Therefore, to the extent the accusing party is relying on an omission to establish fraud, it must present "evidence of a purpose to conceal" the information from the PTO.  Id. at 808.

### Factual Background Giving Rise to Dorel's Claims of Fraud on the PTO

In evaluating whether the evidence in this case supports a *prima facie* showing of fraud on the PTO, it is important to appreciate the factual context in which Dorel's present motion to compel arose.  The evidence in the record before this court shows that Cozy was incorporated in or about 2006.  (Docket No. 326-3 at 48).  One of the company's first employees was Dr. Rajiv Menon, who worked part-time as a Technologist involved in, among other things, the development and implementation of what Dr. Rajasingham described as "air cushion technology" for use in car seats.  (Id. at 48-49, 59).  In or about 2008, Dr. Menon turned down an offer of full-time employment at Cozy and took a job with Dorel instead.  (Id. at 54).  Shortly thereafter, Dorel filed U.S. Provisional Application No. 61/084,889.  (See Docket No. 37 at CM/ECF Page 3 of 27).  According to Dr. Rajasingham, this was the first of various patent

[9]

applications covering what Dorel claimed was its own air cushion technology.  (See Docket No. 1 ¶ 6; Docket No. 326-3 at 60).

The parties subsequently entered into discussions regarding a potential collaboration. (Docket No. 326-3 at 64).  However, in or about June 2009, shortly after a meeting took place between Cozy and Dorel, Dorel announced the launch of its AirProtect® side impact protection technology for use in child car seats.  (See Docket No. 1 at Ex. A; Docket No. 37 at CM/ECF Page 1 of 27).  Dr. Rajasingham claims that he was shocked by this development because he believed Dorel had stolen this technology from Cozy.  (Docket No. 326-3 at 65-66, 69).  However, it is undisputed that Cozy took no steps at that time to obtain an injunction or file infringement claims against Dorel.  Instead, Cozy waited more than 11 years, until January 2021, to file the instant infringement action against Dorel.

Notwithstanding Dr. Rajasingham's view that Dorel had stolen his technology, the parties continued to meet and discuss a potential collaboration or licensing arrangement.  The chronology of the parties' interactions, as well as Dr. Rajasingham's communications with the PTO, are described in this court's Memorandum of Decision and Order on Plaintiff's Motion to Dismiss Counterclaims (Docket No. 130), which is incorporated herein by reference.  As that chronology illustrates, after each of Dr. Rajasingham's unsuccessful attempts to convince Dorel to license his technology, Dr. Rajasingham approached the PTO and engaged in various efforts to obtain new patents or amend existing patents.

Significantly, the record shows that in the intervening years between Dorel's launch of AirProtect® and the initiation of this lawsuit, Dr. Rajasingham prosecuted and obtained two new Patents consisting of the '298 and '739 Patents that are at issue in this case.  (See Docket

No. 179-1 at CM/ECF Page 2 of 57; Docket No. 179-2 at CM/ECF Page 2 of 55). Unlike Dr.

Rajasingham's other patents, both of these Patents claim child seats involving a system of

airbags for use in vehicles. (See Docket No. 179-1 at CM/ECF Page 56 of 57; Docket No. 179-2

at CM/ECF Page 54 of 55). Additionally, both Patents claim the benefit of earlier patent

applications dating back to 1999, long before Dorel filed its own patents relating to the

AirProtect® technology. (See Docket No. 179-1 at CM/ECF Page 2 of 57; Docket No. 179-2 at

CM/ECF Pages 2-3 of 55). Throughout this litigation, Dorel has maintained, and Cozy has

denied, that Dr. Rajasingham drafted and prosecuted the '298 and '739 Patents with the aim of

capturing Dorel's technology and holding Dorel liable for infringement, rather than protecting

legitimate patent rights belonging to Dr. Rajasingham and/or Cozy. Dorel's position finds

support in this court's June 22, 2023 Memorandum of Decision and Order on Dorel's Motion for

Summary Determination of Priority Dates (Docket No. 360) ("Summary Judgment Order"),

which is expressly incorporated herein by reference. Therein, this court determined, as a

matter of law, that the '298 and '739 Patents cannot claim priority to 1999 because one of the

patents in the priority chain dating back to 1999 -- U.S. Patent No. 9,150,127 (the "'127 Patent")

-- shares no common subject matter with the Asserted Patents. Accordingly, this court allowed

Dorel's motion for a summary determination that the priority dates of the '298 and '739

Patents correspond to their application filing dates of January 20, 2015 and September 9, 2015,

respectively, well after the filing of Dorel's patents relating to its AirProtect® technology. Dr.

Rajasingham's alleged efforts to have the '298 and '739 Patents date back to 1999 to cover

Dorel's technology are at issue in the instant motion to compel.

The record also shows that during the time period between Dorel's launch of

AirProtect® and the filing of the instant case, Dr. Rajasingham engaged in substantial efforts to

correct and/or amend the priority dates of the '416 and '835 Patents, the other two Patents at

issue in this litigation, by filing Requests for Certificates of Correction, Application Data Sheets

("ADSs") and related documentation with the PTO.  Dorel asserts, and Cozy disputes, that Dr.

Rajasingham's purpose in filing his most recent Requests for Certificates of Correction was to

extend the expiration dates of the '416 and '835 Patents so he could maximize the amount of

damages Cozy could seek from Dorel.  As described in the Summary Judgment Order, the

undisputed facts demonstrate that in connection with his efforts to amend the '416 and '835

Patents in 2016 and 2017, Dr. Rajasingham failed to notify the PTO about the Certificates of

Correction that had been issued for those Patents in 2012, by which Dr. Rajasingham had

(inconsistent with his subsequent position) claimed an earlier priority date.  An issue raised by

Dorel's present motion is whether Dr. Rajasingham's representations and omissions to the PTO

regarding the priority dates of the Asserted Patents were fraudulent, and if so, whether he

relied on his counsel's advice to perpetuate the alleged fraud.

### Evidence of Fraud

Although Cozy attempts to draw this court's attention to Dr. Rajasingham's specific

filings with the PTO in connection with its opposition to the instant motion to compel, this court

cannot ignore the overall record presented to the PTO during Dr. Rajasingham's prosecution of

the Asserted Patents.  As illustrated by the evidence presented on summary judgment, Cozy's

priority claims with respect to the Asserted Patents are so lengthy and convoluted as to render

them nearly incomprehensible.  By way of example, the priority chain for the '298 Patent spans

approximately two full columns of text and the priority chain for the '416 Patent, as set forth in

a November 6, 2012 Certificate of Correction, continues over two full pages of text.  (See

Docket No. 179-1 at CM/ECF Pages 2-3 of 57; Docket No. 179-3 at CM/ECF Pages 55-56 of 56).

Additionally, while Dr. Rajasingham purported to correct and clarify his priority claims with the

filing of Requests for Certificates of Correction and ADSs for the '416 and '835 Patents, his

shifting priority dates and failure to use strike-throughs or brackets to replace language added

by the 2012 Certificates of Correction rendered the final patent language virtually impossible to

decipher.  Instead of clarifying the priority claims, Dr. Rajasingham's changes further

complicated what had already been an extremely complicated record.

  The convoluted nature of Dr. Rajasingham's priority claims is emblematic of the

Asserted Patents as a whole.  The specifications of the Asserted Patents, including the drawings,

descriptions of the inventions and lengthy descriptions of embodiments, have little obvious

connection to the Patents' claims.  These circumstances made it unusually challenging to

construe the disputed claim terms in this case.  They have also contributed to the volume and

complexity of the disputes that have arisen during the course of the litigation.  Similarly, the

patent histories are voluminous, making it impossible for either party to present a cogent

description of events to the court.  Consequently there is a sufficient basis for the court to

assume that the nature of the Asserted Patents, including the asserted priority chains, created

confusion for the PTO's Patent Examiners as well.

  Since the beginning of this case, Cozy has attributed the confusion surrounding the

Asserted Patents to the fact that Dr. Rajasingham was acting *pro se*, without assistance from

counsel or other specialized patent practitioners.  Throughout almost the entirety of this

litigation, Cozy has asserted in its written submissions, during oral argument, and in Dr. Rajasingham's November 2022 deposition testimony, that Dr. Rajasingham was acting alone when he prosecuted and amended the Asserted Patents before the PTO.  Cozy confirmed this assertion in a response to Dorel's interrogatories when it stated that "no attorney [was] consulted, hired, and/or communicated with regarding filing, prosecuting, amending, and/or correcting any Asserted Patent or associated patent applications."  (Docket No. 358 at CM/ECF Page 3 of 9 (alteration in original; internal quotations omitted)).  The documents submitted *in camera* have shown that these representations are untrue, as Cozy apparently recognized when it amended its answers to interrogatories again after the court ordered the *in camera* review of the privileged documents.  Having repeatedly represented to the court that Dr. Rajasingham did <u>not</u> communicate with counsel in connection with the patent application process, Cozy now seeks to have the court (and Dorel) accept that he did communicate with counsel in connection with these applications.[5]  While it appears that Dr. Rajasingham took sole responsibility for filing materials with the PTO and communicating with the Patent Examiners throughout the prosecution process, the documents demonstrate that he was working closely with his counsel to prosecute, amend and/or correct the Asserted Patents in a manner that would support his infringement claims against Dorel.  It is against this backdrop that this court considers Dorel's claim that Cozy engaged in fraud on the PTO.

---

[5] It was only after Cozy was ordered to submit the privileged documents to the court for an *in camera* review that it amended its interrogatory responses to state that Dr. Rajasingham <u>was</u> communicating "with one or more of [his] counsel regarding his prosecution of applications for some of the Asserted Patents or associated patent applications between 2014 and 2017."  (Docket No. 358 at CM/ECF Page 4 of 9).

<u>The '416 and '835 Patents</u>

The record before this court contains sufficient evidence by which a factfinder could reasonably conclude that Dr. Rajasingham engaged in fraud on the PTO with respect to the priority dates of the Asserted Patents, as part of a strategy to manipulate the scope of the Patents and capture Dorel's technology.  With respect to the '416 and '835 Patents, it is undisputed that at the time he filed his most recent Requests for Correction and ADSs with the PTO in 2016 and 2017, Dr. Rajasingham failed to alert the PTO to the existence of the 2012 Certificates of Correction or the substance of the priority claims contained therein even though applicable regulations required him to do so.  (<u>See</u> Summary Judgment Order at 34-36, 41-42). By his actions, Dr. Rajasingham withheld from the PTO the fact that he had taken contrary positions in the past, when he had deemed an earlier priority date more advantageous. Consequently, the evidence demonstrates that he misled the PTO about the status of his priority claims.

The record also indicates that Dr. Rajasingham misled the PTO about the basis for his amendments to the '416 and '835 Patents.  Under 35 U.S.C. § 255, the PTO is authorized to issue Certificates of Correction "[w]henever a mistake of a clerical or typographical nature, or of minor character, which was not the fault of the [PTO], appears in a patent and a showing has been made that such mistake occurred in good faith[.]"  Dr. Rajasingham apparently understood these requirements because he informed the PTO, in connection with the filing of his Requests for Correction, that his "mistakes were made in good faith[.]"  (Docket No. 183-1 at CM/ECF Page 2 of 3; Docket No. 244-6 at COZY_0000001163).  However, the evidence illustrates that the changes Dr. Rajasingham was requesting in 2016 and 2017 were not mere

clerical, typographical or similar types of minor errors, but rather involved substantive changes to the priority dates of the '416 and '835 Patents.  The Federal Circuit has ruled that "[a] claim for priority is inherently material to patentability because a priority date may determine validity, whether an issue arises in prosecution or later in court challenges to validity."  Nilssen v. Osram Sylvania, Inc., 504 F.3d 1223, 1233 (Fed. Cir. 2007).  A factfinder could reasonably conclude from the evidence before the court that Dr. Rajasingham made material misrepresentations and omissions to the PTO with respect to the '416 and '835 Patents.

A factfinder could also conclude that Dr. Rajasingham acted with the requisite intent to support a claim of fraud.  While Cozy asks this court to find that Dr. Rajasingham acted in good faith because he was proceeding pro se (see Docket No. 341 at 12-14), the facts are to the contrary.  Moreover, as described in detail in the Summary Judgment Order and illustrated by the evidentiary record before this court, Dr. Rajasingham knew how to properly amend patents yet he failed to follow proper procedures and hid information from the PTO while seeking to change the priority dates of the '416 and '835 Patents.  (See Docket No. 342-4 at COZY_0000004036-48; Summary Judgment Order at 34-36, 41-42).  Additionally, but again without limitation, Dr. Rajasingham testified during his deposition in this case that the changes he made to the priority dates of his patents were intended to extend the life of the patents and maximize their value.  (Docket No. 326-3 at 127-28, 140, 257).  This is inconsistent with Dr. Rajasingham's representations to the PTO that his amendments were minor and were aimed at remedying "mistakes ... made in good faith."  It also constitutes evidence of an intent to mislead the PTO regarding the basis for his amendments.  Finally, the documents reviewed by this court in camera indicate that Dr. Rajasingham was strategizing with counsel about

[16]

adjusting the priority dates of his patents in order to craft his infringement theories and maximize his potential damages against Dorel.[6]  Accordingly, a factfinder could reasonably conclude that he was lying to the PTO in order to conceal the fact that his true purpose in seeking to amend the Asserted Patents was to prepare for litigation against Dorel.

There can be no genuine dispute that the PTO relied on the representations set forth in Dr. Rajasingham's ADS and Request for Correction when it issued a new Certificate of Correction for the '835 Patent.  Nor is it unreasonable to conclude that the PTO would not have approved the amendments if it had known about the alleged misrepresentations and omissions.  While the PTO declined to issue a Certificate of Correction for the '416 Patent, the record provides sufficient evidence to support a finding of detrimental reliance with respect that Patent as well.  There is no question that the PTO reviewed the 2016 Request for Correction and accompanying ADS that Dr. Rajasingham submitted for the '416 Patent.  Nor is there any question that the PTO denied Dr. Rajasingham's Request and dismissed it as moot because Dr. Rajasingham was asking the PTO to recognize a priority claim that the PTO had already recognized in the original filing receipt and originally issued patent.  Nevertheless, a factfinder could reasonably conclude that Dr. Rajasingham's failure to alert the PTO to the existence of a different priority claim in the previously issued 2012 Certificate of Correction caused the PTO to unwittingly make misleading statements about the correct priority date in the record for the '416 Patent.  Therefore, the circumstances presented here are sufficient to establish "a justifiable reliance upon the misrepresentation by the party deceived which

---

[6] Any references to the contents of the documents that Cozy submitted for an *in camera* review pertain only to those documents that Cozy is ordered to produce pursuant to this Memorandum of Decision and Order.

induces him to act thereon, and ... injury to the party deceived as a result of his reliance on the misrepresentation."  <u>Spalding Sports</u>, 203 F.3d at 807 (citation omitted).

<u>The '298 and '739 Patents</u>

With respect to the '298 and '739 Patents, the record before this court establishes that Dr. Rajasingham included a patent in the chain of priority -- the '127 Patent -- that was improper because it lacked subject matter support for the Asserted Patents.  As a result, Dr. Rajasingham's representations to the PTO that those Patents claimed priority to 1999 were false.  A factfinder could reasonably conclude that Dr. Rajasingham included the '127 Patent in the priority chains for the '298 and '739 Patents to deceive the PTO into issuing the Patents.  It is undisputed that Dr. Rajasingham successfully prosecuted over 50 different patents.  (Docket No. 326-3 at 191).  Therefore, it is reasonable to infer that he understood the intricacies of patent prosecution, including the requirements necessary to establish priority.  The record, including the documents submitted to the court *in camera*, also indicates that Dr. Rajasingham was seeking to establish infringement claims against Dorel at the time he was prosecuting the '298 and '739 Patents before the PTO, and that he recognized the need to be strategic in his assertion of priorities for those Patents.  Furthermore, as described in detail in the Summary Judgment Order, the differences between the specifications of the '298 and '739 Patents on the one hand and the specification of '127 Patent on the other are substantial.  Accordingly, a factfinder could reasonably infer that Dr. Rajasingham knew, or was reckless in not knowing, that the '127 Patent lacked subject matter support for the Asserted Patents and broke the chain of priority.

[18]

In assessing whether Dr. Rajasingham was acting with the intent necessary to support a claim of fraud on the PTO, and whether the PTO relied on Dr. Rajasingham's misrepresentations to its detriment, this court finds it significant that Dr. Rajasingham buried the '127 Patent in a lengthy and convoluted list of patent applications that make up the priority chains of the '298 and '739 Patents. This makes it extraordinarily difficult to trace the priority claims of those Patents, much less determine whether the applications and patents listed therein maintain the continuity of disclosure necessary to support those claims. Given that Dr. Rajasingham's repeated justification for such confusion -- i.e., that he was acting *pro se* -- has turned out to be questionable, it is reasonable to conclude that Dr. Rajasingham's decision to bury the '127 Patent in what could be characterized as a morass of patent applications was part of a strategy to capture Dorel's technology by misleading the PTO into issuing patents with inappropriate priority dates. Although it is impossible to know at this stage what Dr. Rajasingham told the PTO about the '127 Patent, if anything, the available evidence pertaining to the priority claims of the '298 and '739 Patents supports a reasonable inference that the PTO would not have issued those Patents if it had known that the inclusion of the '127 Patent broke the chain of priority. Therefore, this court finds that the record with respect to each of the Asserted Patents supports Dorel's claim of fraud on the PTO.

### B.  Use of Counsel's Advice in Furtherance of Fraud

The next issue raised by Dorel's motion to compel is whether there is sufficient evidence to show that the attorney-client communications submitted to the court *in camera* were in furtherance of the alleged fraud, such that they enabled or aided Dr. Rajasingham "to commit what [he] knew or reasonably should have known to be a ... fraud" on the PTO. Rakes, 136 F.3d

[19]

at 4.  For the reasons that follow, this court finds that a number of the communications in

Cozy's *in camera* submissions satisfy the applicable standard.  Therefore, Cozy is ordered to

produce them pursuant to the crime-fraud exception.

This court has engaged in a careful, document-by-document review of the attorney-

client communications at issue.  To the extent the documents consist of communications that

are unrelated to Dr. Rajasingham's alleged efforts to manipulate the scope of the patents and

adjust the priority dates, Dorel's motion to compel their production is denied.  With respect to

the remaining documents, however, a factfinder viewing those documents in the context of the

record evidence could reasonably conclude that Dr. Rajasingham obtained advice from his

counsel in furtherance of his strategy to establish priority dates that would support

infringement claims against Dorel.  Additionally, a factfinder viewing the documents could

reasonably conclude that Dr. Rajasingham made the alleged misrepresentations and omissions

to the PTO in order to implement this strategy and thus relied on the advice of his counsel to

mislead the PTO.  In reaching this conclusion, this court is informed by the totally of the

evidence presented in the record, as well as Dr. Rajasingham's repeated insistence, through

years of this litigation, that he never relied on counsel for assistance or advice in "filing,

prosecuting, amending, and/or correcting any Asserted Patent or associated patent

application."  (See Docket No. 358 at CM/ECF Page 3 of 9).  The documents submitted *in*

*camera*, as well as Cozy's about-face in its answers to interrogatories discussed above,

challenge the veracity of these statements.  The record indicates that Dr. Rajasingham

manipulated the PTO into recognizing priority dates to which he was not entitled by presenting

himself to the PTO as acting *pro se* while acting in furtherance of a strategy developed with

advice of counsel.  Because those documents support a strong inference that Dr. Rajasingham relied on the advice of his counsel to perpetrate a fraud on the PTO, this court concludes that they fall within the scope of the crime-fraud exception to the attorney-client privilege.

## V. **CONCLUSION**

For all the reasons described herein, Dorel's motion to compel based on the crime-fraud exception to the attorney-client privilege (Docket Nos. 201, 325) is ALLOWED IN PART and DENIED IN PART.  Specifically, the motion is allowed with respect to the documents listed on Exhibit A attached hereto but denied with respect to the remaining documents.


/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge